**Curtis H. SMITH, 462–56–2584, Plaintiff-Appellant,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.**

No. 79–3615.

United States Court of Appeals, Fifth Circuit.
Unit A

June 4, 1981.

Rehearing Denied Aug. 19, 1981.

Chapman, Tinsley & Reese, Carlyle H. Chapman, Jr., Dallas, Tex., for plaintiff-appellant.

William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., Charles F. Sandoval, Asst. U. S. Atty., Albuquerque, N. M., for defendant-appellee.

Before BROWN, COLEMAN and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Appellant, Curtis H. Smith, attacks a decision of the Secretary of Health and Human Services (Secretary) terminating as of November 1977, his Social Security Disability Insurance Benefits and Supplemental Security Income pursuant to 42 U.S.C.A. § 405(g), as amended, and 42 U.S.C.A. § 1383(c), as amended. These benefits had previously been awarded Smith based upon a finding of "disability" which had commenced on May 23, 1974, following a car/tractor accident in which Smith had sustained serious neck and back injuries. The decision of the Administrative Law Judge (ALJ) which terminated Smith's "disability" status became the final decision of the Secretary following what was referred to as a "de novo" consideration of additional evidence by the Appeals Council in December of 1978. Smith sought judicial review in the District Court on January 25, 1979. On a motion for Summary Judgment, the District Court affirmed the cessation of Smith's benefits finding that (i) the proper legal standards had been employed by both the ALJ and Secretary and (ii) there was substantial evidence to support the final decision. The only real issue before this Court is whether substantial evidence reading the record as a whole supports the Secretary's final decision terminating Smith's disability as of November 1977. We hold it does not and reverse and remand.

### Scrubbing Up—Our Standard Of Review

Our standard of review is both provided for and limited by § 205(g) of the Social Security Act, 42 U.S.C.A. § 205(g), which states that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. . . ." *Fruge v. Harris*, 631 F.2d 1244 (5th Cir. 1980); *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980); *Fortenberry v. Harris*, 612 F.2d 947 (5th Cir. 1980); *Newborn v. Harris*, 602 F.2d 105 (5th Cir. 1979); *Chaney v. Califano*, 588 F.2d 958 (5th Cir. 1979); *Young v. Califano*, 581 F.2d 549 (5th Cir. 1978); *Mims v. Califano*, 581 F.2d 1211 (5th Cir. 1978). Of course, no similar presumption of validity attaches to the Secretary's conclusions of law, including determination of the proper standards to be applied in reviewing claims. We are aware, of course, that we may not reweigh the evidence or substitute our judgment for that of the Secretary's. *See Rhynes v. Califano*, 586 F.2d 388, 390 (5th Cir. 1978); *Laffon v. Califano*, 558 F.2d 253 (5th Cir. 1977). This very narrow ambit of judicial review, however, does not excuse us from our responsibility to scrutinize the record in its entirety to determine whether

substantial evidence does support the Secretary's findings. *Flowers v. Harris*, 616 F.2d 776 (5th Cir. 1980); *Simmons v. Harris*, 602 F.2d 1233 (5th Cir. 1979).[1]

■ In our search for substantial evidence we are guided, as the hearing examiners are, by consideration of (i) objective medical facts or clinical findings, (ii) diagnoses of examining physicians, (iii) subjective evidence of pain and disability as testified to by the claimant, and (iv) the claimant's age, education and work history. *Johnson v. Harris*, 612 F.2d 993, 997 (5th Cir. 1980); *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980); *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972). We also recall that the scheme of the act requires the claimant to carry the initial burden of establishing the existence or continued existence[2] of a disability by proving that he is unable to perform his previous work. Once this is shown, the burden shifts to the Secretary to establish that there is other substantial gainful employment in the economy which the claimant can perform. If the Secretary points to possible alternative employment, the burden of persuasion then returns to the claimant to prove his inability to perform those jobs. *Western v. Harris*, 633 F.2d 1204 (5th Cir. 1981); *Fruge*, 631 F.2d at 1245; *Johnson*, 612 F.2d at 993.

Given these statutory requirements for showing disability, our judicially declared guidelines, and our limited scope of judicial review, we now begin our examination of the record in quest of substantial evidence.

1. We have infrequently reversed the secretary's finding of no disability when not supported by substantial evidence. *See McDaniel v. Harris*, 639 F.2d 1386, 1388 (5th Cir. 1981).

2. The burden of establishing disability is the same as that of showing continued existence of disability.

This case, unlike the majority of reported cases arising under § 216(i) and § 223 of the Act, involves a determination of disability benefits rather than an initial denial of benefits. However, the standards to be applied by the Court in reviewing a termination of benefits do not differ materially from those

## Dissecting The Facts—The Evidence Presented At The Hearing

### A. Age, Education, Work Experience

Appellant Smith is presently 42 years old, married with four children and possesses a seventh grade education with no vocational or specialized training. His job experiences include grocery stock clerk, carton-packing machine operator for a milk company, unskilled sheet metal handler for a trailer manufacturer, and ranch-hand for a cattle company. In 1968, Smith was employed by Tarrant County as a heavy equipment operator where he worked until he was injured in an accident on May 23, 1974, when an automobile struck the mowing tractor which he was operating.

### B. Objective Medical Facts And Clinical Findings

Smith was immediately hospitalized complaining of pain in the cervical and lumbosacral regions and the left hip, with circulatory problems occurring in the left leg. He was treated for these injuries by Dr. Issac L. Van Zandt, an internist and orthopedic surgeon in Ft. Worth, Texas. A set of back x-rays in July 1974 showed Smith to have a low back defect with a first degree spondylolisthesis—a Greek term basically meaning one bone slipping onto another. By September 1974, Smith's condition had worsened and extensive spinal surgery—a bilateral fusion at L4–S1—was performed in October 1974 by Dr. Van Zandt.

### C. Diagnosis

Dr. Van Zandt's post-operative clinical notes indicate that Smith continued to complain of a disabling pain in the lower back,

applied in reviewing a denial of benefits. A prior determination of the Secretary that a claimant had a disability which entitled him to benefits does not bar a later determination of those benefits. (Case cites omitted) In a case in which benefits have been terminated, as in a case in which benefits have been denied, the burden of proving disability is on the claimant, not on the Secretary. (Case cites omitted) Thus the claimant has the burden of proving that his disability did, in fact, continue.

*Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972).

radiating through the left hip area, leg and foot, despite medications,[3] injections,[4] physical therapy and use of a supportive girdle. By January 1976, Dr. Van Zandt notes that Smith's back condition was considerably better since the October back surgery, but that he continued to experience pain while standing, squatting, kneeling, sitting and was required to rest two-to-three hours a day. The doctor concluded that he had "probably reached a plateau" and was "not going to get any improvement in the future." (R., Vol. II at 126). At this time, Dr. Van Zandt advised Smith to seek the help of the Texas Rehabilitation Commission (TRC) for possible employment retraining.

Acting on this advice, Smith sought the assistance of the TRC in June 1976. Case worker Malone who evaluated Smith's abilities and potential capabilities, found him cooperative and willing to attempt "any assigned tasks with the best of his ability", (R., Vol. II at 379), but unable to complete tasks due to pain.[5] The TRC advised Smith by letter that "vocational rehabilitation services may not reasonably be expected to benefit you in terms of employment". (R., Vol. II at 187).

In July 19, 1976, Dr. Van Zandt referred Smith to Dr. Hoover in Dallas for an electromyography (EMG). These test results were "mildly abnormal" indicating a probable mild 'chronic' L–5 nerve root irritation residual on the left side—residuals from the previous surgery. These findings and analysis were concurred in by Dr. Van Zandt. Consulting evaluations by Dr. Fred Sanders,[6] another orthopedic surgeon, and Dr. Ronald Smith,[7] a neurosurgeon, in March

---

3. In October 1975 Smith was referred by Dr. Van Zandt to Dr. Charles Bradshaw, a psychiatrist, in an unsuccessful attempt to prescribe medication. In his oral deposition, Dr. Van Zandt testified:

Q: Now, what was this man's course over this period of time, doctor? [July 1975 to June 1976]
A: Well, I thought it was probably up and down a little. I didn't think he was capable. I didn't feel like that I had much to offer him. I gave him medication, he would take more than was advised. So I sent him to get psychiatric evaluation, not that I felt that the man was crazy, but psychiatrists usually are pretty, well—they are excellent in either changing the pain medication or giving new medication or deciding whether it should be given at all.
Q: In your opinion, was Mr. Smith aided by this doctor?
A: I don't think so.

4. In July 1975, Smith was again hospitalized to receive injections into the nerves of his thigh.

5. Appellant testified at the Appeal Hearing as to the nature of his evaluation with the Texas Rehabilitation Commission:

A: They had me to set at a table and do tests, like going through the phone book, running a cash register, electrical work like soldering wires, sorting out bolts, running a machine that, a little old machine that made names on plastic, running a band saw, and, and doing crafts, and just stuff like that.
Q: Now, what problems did you have in doing those things?
A: I couldn't set there. I couldn't stay to set, stand there.

My nerves, I'd just go, getting so tensed up that, you know, just something that didn't just go right, they had this—bawl me out; and I'd just get so tied up I couldn't, couldn't just set there.
Q: So the two principal problems that you had is the business of, just the physical ability to stand or sit—
A: Right.
Q: —whatever the job required?
A: Right.
Q: And the other was the high tension provoking, anxiety provoking—
A: Yes, sir.
Q: —nature of the work, once you made an effort?
A: Yes sir.
R., Vol. II at 90, 1–25, 91, 1.1.

6. Dr. Sanders' examination revealed a range of motion of the lumbar spine 40% of normal for his age and body build; tenderness in the middle low back along the lower lumbar scar; hyperreflexia of the knee jerks and some mild depression of the left ankle jerk as compared with the right ankle. The diagnosis—"persistent radiculitis with apparently solid fusion." R., Vol. II at 202–203.

7. On March 30, 1977 Dr. Smith recorded Smith's pain in the lower back, pain and numbness in the left lower extremity radiating into left buttocks, calf and foot, neck pain and occasional dizziness. The results of Dr. Smith's examination led him to the opinion that it was "likely that [Smith's] symptoms are in the nature of residuals." R., Vol. II at 205–207.

1977, agreed with Dr. Hoover's and Dr. Van Zandt's opinions that Smith's continued pain was caused by residuals of previous surgery. A second EMG study in April 1977 substantially confirmed the diagnosis of these four doctors.

### D. Subjective Evidence

These medical reports were corroborated by Smith's own subjective testimony before the ALJ in October 1977. He stated that since the 1974 accident, he had experienced constant severe pain in his back from his neck to his hips and radiating into his legs, feet and toes. The pain was so disabling that he could not engage in house or yard work, shopping, hunting, fishing or any physical activity outside of church attendance or short trips to pick up his children from school. Smith testified that he had trouble remaining in a stationary position for more than five minutes,[8] and that stooping, bending, stair-climbing and lifting were difficult to impossible due to pain and stiffness. Smith concluded by stating that he did not know of any eight hour day work he could be capable of because of his lack of education and his back trouble. (R., Vol. II at 66, 67, 77, 81, 95).

Before making a final decision in Smith's case, the ALJ on November 8, 1977, ordered Smith examined by a Social Security physician, Dr. Farooq I. Selod. Based upon his single examination of Smith, Dr. Selod's diagnosis substantially agreed with the other medical opinions[9] that Smith was suffering from "residuals of previous back injuries", but he was of the opinion that Smith could perform a six-eight hour sitting job using his upper extremities absent repetitive movements of both feet.

Besides Dr. Selod's evaluations, the ALJ considered the recommendations of Austin Foster, an administrative vocational psychologist, who testified at the hearing in response to two sets of hypothetical questions. The ALJ posed the first hypothetical which was premised on the physical capabilities outlined by Dr. Selod, i. e., that if he [ALJ] were to find an individual capable of engaging in strictly sedentary types of work with emphasis on the upper extremities, what types of work would the witness find existing in the national economy. In response, Foster listed (i) repetitive piecemeal bench work involving the use of hand tools—staples, drills and punch presses, grinders, (ii) gauge and dial monitoring jobs, (iii) self-service gas station attendant, (iv) dispatcher work, and (v) department store security guard. Smith's attorney posed the second hypothetical with the additional findings and limitations by Dr. Van Zandt—mid-morning and afternoon rest breaks.[10] In this response Foster speculated that these additional factors would require jobs that are "rather specialized,[11] and

---

**8.** After sitting one-half hour at the Appeals Hearing, Smith asked the ALJ for permission to stand to alleviate the pain and stiffness he was experiencing in his back. R., Vol. II at 79.

**9.** Dr. Selod's consultive report also reflected Smith's complaints of pain in the low back, always present, sharp in nature, aggravated by coughing, sneezing and bending; pain in Smith's mid-back and neck; radiation of pain down to left leg and foot. Dr. Selod also noted Smith's complaint that his arm goes to sleep on him, that he has a "problem with his nerves". On examination, Dr. Selod found limitations on flexion, extension, rotation bilaterally, lateral bending on both sides; one + tenderness on palpation of upper dorsal; one + tenderness and spasms in paraspinous muscles of midline scar in lumbar area; 65° SLR "bilaterally", with bilateral low back pain. Neurologically: hyperthesia on left side was make-and-break pattern on motor testing. R., Vol. II at 297.

**10.** Excerpt from Dr. Van Zandt's oral deposition which was admitted into evidence at the appeals hearing:

Q: In your opinion, based on reasonable medical probability, how much of a break will he need in addition to the lunch break.
A: Oh, thirty minutes or sixty minutes.
Q: I'm sorry, Doctor, are you saying thirty to sixty minutes.
A: Yes.
Q: Two of them, Doctor?
A: Yes.
Q: One in the morning and one in the afternoon?
A: Yes.

R., Vol. II at 20-21.

**11.** In this connection we observe the regulation's criteria as to what constitutes work which exists in the national economy to exempt those areas which are more specialized.

§ 404.1509 **Work which exists in the national economy.**

this would I judge, if this were necessary, constitute a major and significant impairment and ability to perform in gainful employment."

So that under a hypothesis that essentially says this man cannot sit and work for a normal period of time, and have to go lie down for long periods of time; if this is the finding, then I would say that there would not be enough ability to be present on a job to do a job.

R., Vol. II at 111.

### Finding And Conclusions By The ALJ

Based on the reports and opinion of Dr. Selod, and the recommendations of the administrative vocational expert, Dr. Foster, the ALJ reached the decision that Smith's disability had ceased as of November 8, 1977. Smith sought review of this termination and submitted additional supportive evidence—April 1978 x-rays and medical reports of his continued disability. Dr. Van Zandt's evaluation of these tests indicated a definite deterioration of the disc at the lumbosacral region and increased fusion to three levels as compared with previous x-rays. Dr. Van Zandt's reports in March 1978 ruled out Smith's engagement in *any* present or future gainful employment due to poor strength and functions in the lower back, secondary involvement of the upper and middle back, loss of motion in the hips and scattered abnormal neurological findings in the feet. In September 1978 another x-ray confirmed a new impairment in the form of a disc disease of the cervical spine.

### Our Diagnosis Of The Record

■ The ALJ's finding that Smith's disability had terminated as of November 1977 was repeated by the Appeals Council, the Secretary, and finally the District Court, in spite of Smith's submission of additional supportive evidence subsequent to 1977. We decline to follow the leader. Instead, based on our impartial consideration of the total record, we find the adverse decision to Smith by these bodies to be unsupported by substantial evidence for at least three reasons.

First, we consider the evidence which was the basis for the ALJ and Secretary's decision. The ALJ stated:

The orthopedic consultative examination of Dr. Farooq I. Selod, performed November 8, 1977, at the request of this Administrative Law Judge *conclusively* establishes as of that date ... by the preponderance of the *credible* evidence that the claimant's disability had in fact ended, his claims notwithstanding. (Emphasis supplied).

R., Vol. II at 27.

Apparently, the evidence supporting the decision consists almost entirely of the testimony of Dr. Selod and the vocational expert Austin Foster. Dr. Selod opined that Smith was capable of handling a six-to-eight hour a day sedentary job involving the use of his upper extremities. We observe that he reached this startling conclusion despite the fact that his medical diagnosis (*see* note 9, *supra*) substantially confirmed those findings testified to by all the other physicians who had treated or examined Smith. In embracing the conclusions

(a) *General.* Work is considered to exist in the national economy when it exists in significant numbers either in the region where the individual lives or in several other regions of the country, regardless of whether such work exists in the immediate area in which the individual lives, or whether a specific job vacancy exists for the individual, or whether the individual would be hired if the individual applied for work. A finding that work exists in the national economy is made when there is a significant number of jobs (in one or more occupations) having typical requirements which do not exceed the individual's physical or mental capacities and voca-

tional qualifications. *Isolated jobs of a type that exist only in very limited number or in relatively few geographic locations outside of the region where the individual resides are not considered to be "work which exists in the national economy" for purposes of determining whether an individual is under a disability*; an individual is not denied benefits on the basis of the existence of such jobs. If work that the individual can do does not exist in the national economy, disability shall be determined to exist. If such work does exist in the national economy, disability shall be determined not to exist. (Emphasis supplied).

of his own consulting physician who examined Smith once, the ALJ has failed to accord the proper legal weight due to the treating physician Dr. Van Zandt. It is not only legally relevant but unquestionably logical that the opinions, diagnosis, and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over a considerable length of time, should be given considerable weight. This Court has recently affirmed such an approach in *Fruge v. Harris*, 631 F.2d 1244 (5th Cir. 1980), where we stated "unless there is good cause shown to the contrary the testimony of the treating physician must be accorded substantial weight." *Fruge*, 631 F.2d at 1246. We there failed to find a "good cause" to the contrary and we do not here.

Also significant, perhaps, is the fact that this Court has recognized that the controverting opinion of a consulting "one-shot" physician selected by the Administration, may, in the circumstances of the particular case, lack substantiality when relied on by the Secretary to contradict the opinion of a longstanding treating physician. In criticizing the Secretary's position in the case of *Williams v. Finch*, 440 F.2d 613 (5th Cir. 1971), that the claimant had been consistently described as "a person in excellent physical condition", but where the claimant's treating doctor found his heart disease to be disabling, this Court stated:

> Although Dr. Langhorne's finding may reasonably be said to negate disability, his examination was limited to one occasion ... under the circumstances of this case, we cannot say that his opinion could furnish the basis for substantial evidence to deny disability benefits.

*Williams*, 440 F.2d at 617 n.6.[12] Moreover, whatever doubts led the ALJ to form "the distinct impression that Dr. I. L. Van Zandt is reluctant to pronounce his patient to be totally and permanently disabled ..." (R.,

Vol. II at 24), we find unfounded by reading of the entire record. In fact, these doubts about Dr. Van Zandt's conclusions are entirely dispelled by the additional reports from Dr. Van Zandt dated March and September 1978 and the following sworn testimony of March 13, 1978:

Q: Now Doctor, do you have an opinion based on reasonable medical probability, your experiences, examination and treatment of this man [in] the course of these years, as to whether or not this man will ever be able to engage in work of any kind or substance in the future?

A: Yes, I have.

Q: What is the opinion, Doctor?

A: I don't think he can.

R., Vol. II at 358.

The second basis of support for the Secretary's case is the testimony of Dr. Foster, the vocational expert, who in response to hypothetical questions put to him by the ALJ testified that Smith was capable of doing sedentary work involving use of his upper extremities. However, when asked by Smith's attorney to consider a person in Smith's physical condition who needed to rest several times during the day, as apparently undisputed evidence indicated Smith needed to do, Dr. Foster opined that such a person would be unemployable. In a factual similar case, this Court unequivocally held that "a physical limitation which prevents the claimant from working a full work day, minus a reasonable time for lunch and breaks, constitutes a disability within the meaning of the Social Security Act." *Johnson v. Harris*, 612 F.2d at 998; *accord Cornett v. Califano*, 590 F.2d 91 (4th Cir. 1978).

Recognizing that we neither have nor seek to exercise any right to make credibility choices, we nevertheless emphasize that "[w]here credibility choices of a

---

**12.** Unlike the Sixth Circuit, where the Rule seems to be almost absolute, we confine this concept to the particular facts of each case.

> Substantial evidence does not sustain a Hearing Examiner's decision when it is based almost exclusively on a medical report of a physician making a single examination of a claimant, when two doctors who treat him over a period of years stated that he was totally disabled. *Miracle v. Celebrezze*, 351 F.2d 361, 379 (6th Cir. 1965).

non-routine medical nature have a likely decisive significance, the record must afford some assurance on these factors, ... [and] [w]e must, first, be certain that the correct standards of evaluation are used." *Page v. Celebrezze*, 311 F.2d 757, 760 (5th Cir. 1963). Because the standard of substantial evidence requires that it be founded on the record as a whole, it is also necessary to consider the evidence supporting Smith's position. In adopting and affirming the findings of the ALJ, the Appeals Council failed to consider new evidence supportive of Smith's position—particularly that evidence dated after 1977. Significantly, when Dr. Van Zandt's reports of March 24, 1978 and April 19, 1978 are read together, they establish without contradiction that Smith had no real improvement as far as strength and function in his lower back from June 30, 1976, to March 10, 1978 *after* the Appeals Council hearing which affirmed the ALJ's termination of Smith's benefits. The situation becomes, therefore, similar to that in *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980), where we stated:

> [T]he Appeals Council adopted the hearing examiner's decision without addressing post-hearing evidence of disability submitted by Dr. Kerr that expressly stated that conservative treatment had failed and that Epps had recently been referred for consideration of the radical intervention believed by the ALJ to be an important indicator of disability. Moreover, Dr. Kerr informed the Appeals Council that Epps continued to suffer pain and limited range of motion, that the contemplated surgery would not increase his productivity, and that there was no possibility that Epps would ever be fit to work in any type of job. Although the Appeals Council acknowledged that Epps had submitted new evidence, it did not adequately evaluate it. Rather, it perfunctorily adhered to the decision of the hearing examiner. This failure alone makes us unable to hold that the Secretary's findings are supported by substantial evidence and requires us to remand this case for a determination of Epps' disability eligibility

reached on the total record. *Mann v. Gardner*, 380 F.2d 182, 187 (5th Cir. 1967).

*Epps,* 624 F.2d at 1267. *See also Williams v. Califano,* 590 F.2d 1332, 1334 (5th Cir. 1979) (remanding for further consideration of relevant probative evidence not explicitly weighed and considered by the Secretary when such consideration was necessary to a just determination of claimant's application).

Third we cannot overlook the apparent lack of weight given Smith's subjective testimony. In referring to these complaints, the ALJ noted:

> His subjective complaints of persisting low back pain are *objectively* supported by some back muscle spasms and reduced sensation on the left. But electromyographic studies as long ago as July, 1976, were only 'mildly abnormal,' indicating no severe nerve involvement or disfunction. X-rays show a solid fusion without motion (emphasis supplied).

R., Vol. II at 26.

As the ALJ's own words reveal, he apparently disregarded Smith's complaints of pain because they were unsupported by objective clinical and laboratory findings. This runs counter to the views voiced for years and years by this Court recognizing that the claimant's subjective complaint of pain may not be disregarded simply because they are not supported by objective clinical and laboratory findings. *Page,* 311 F.2d at 757. Subjective evidence of pain and disability must be considered along with the objective medical facts, clinical findings and diagnosis, and the claimant's age, education and work history before arriving at a conclusion of disability based on the record as a whole. *DePape,* 464 F.2d at 92. Even subjective complaints of pain, if credited, standing alone can sustain a finding of disability in certain cases. *Western,* 633 F.2d at 1204; *Gaultney v. Weinberger,* 505 F.2d 943 (5th Cir. 1974); *Page,* 311 F.2d at 757. By these standards, the ALJ should have addressed the ultimate issue of whether or not Smith's subjective pain was so constant and intense as to be disabling. This failure is even more pronounced considering that

Smith's complaints of pain were sufficiently corroborated by an abundance of medical evidence consisting of (i) x-rays showing permanent fusion in the back, (ii) disc degeneration in the cervical spine, (iii) tests evidencing poor function and strength of the back, and (iv) abnormal neurological findings in the feet.

### Post Operative Relief

From our review of the entire record, we can find *only* the reported opinion by Dr. Selod stating that Smith is capable of sedentary work using his upper extremities as *any* evidence that his disability should not be continued. Even this evidence is contradicted by the doctor's own corroborated Physician Capabilities Evaluation Chart which indicates the doctor circled three-four hour *maximum* capacity standard for sitting and checked conflicting boxes designating can never "lift up to ten pounds" or "only occasionally lift up to ten pounds." (R., Vol. II at 298).

The findings of the ALJ do not meet our understanding of substantial evidence on the record as a whole. "Substantial evidence" has been defined as more than a scintilla and must do more than create a *suspicion* of the existence of the facts to be established. It means such relevant evidence as the *reasonable* mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 852 (1971); *NLRB v. Columbian Enameling and Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, 665 (1939), *citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 209, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938). We therefore remand this case to the District Court with instructions that it be returned to the Secretary for a full evaluation in the light of controlling principles of all the evidence including the new evidence submitted by Smith after 1977 and any further new evidence submitted by either or both parties and received by the ALJ.

REVERSED and REMANDED.

GEE, Circuit Judge, dissenting:

I voice a mild dissent from the judgment since there is, in my view, substantial evidence on both sides of this case.

On the one hand, we have essentially the evidence of Mr. Smith, the claimant, and of his treating physician, Dr. Van Zandt. This is set out in the court's opinion and need not be repeated here in detail: it, and that of referral specialists, may fairly be epitomized as demonstrating the presence of an abnormal lower back condition in Mr. Smith resulting from the imposition of an injury on congenital spinal defects, a condition successfully (though not perfectly) repaired by a spinal fusion that left relatively mild objective symptoms and restrictions but many subjective complaints of pain by Mr. Smith. On the other hand stood the evidence of Dr. Selod, a specialist in physical medicine and rehabilitation, which noted the above findings without serious disagreement but noted as well Mr. Smith's good general health, the absence of atrophy in his lower limbs, and the entire absence of the normal objective residuals of such prolonged, severe, and unremitting pain as Mr. Smith described: marked weight loss, disruption of nutritional process, muscle wasting, or other local morbid changes.[1] In

---

[1] A fair sample of the more detailed findings, not only of Dr. Selod but of others, is taken from the brief of the Secretary:

Dr. Isaac L. Van Zandt, an internist and orthopedic surgeon, first saw appellant on May 26, 1974, for complaints of back, neck and leg pain following an accident. Appellant was treated conservatively but without any significant improvement. Back X-rays showed low back traumatic and congenital anomalies of spondylolisthesis and spina bifida occulta. On October 15, 1974, spinal surgery was performed. Dr. Van Zandt continued to treat appellant until July 29, 1975, when appellant was hospitalized for persistent complaints of pain in his right hip radiating into his leg. His condition improved following bedrest, analgesics, and injections in the right lateral femoral nerve. When the doctor examined appellant in January 1976, he stated that appellant's back condition had become considerably better since the surgery.

An EMG was performed in July 1976, and it was reported as mildly abnormal. The findings indicated a probable mild chronic

short, the evidence reveals general agreement among many physicians about the absence of significant objective support from Mr. Smith's complaints about disabling pain and a physical condition, on the basis of what could be seen, felt or tested by the experts, which, though imperfect, is not disabling in a 41-year-old man such as Smith.

The dispositive question in the case is simply whether to believe Mr. Smith's account of the disabling nature of his pain or not to: a straight credibility choice. Noting all of the above, plus Smith's testimony about his driving habits, daily routine, his demeanor, and the testimony of a vocational expert, the judge who heard his testimony and observed him concluded that he was not so wracked with pain as he claimed. I am not sure the judge was right in his credibility choice. Sure I am, however, that he was in a better position to make it than we are. I therefore respectfully dissent.

L–5 foot irritation on the left side. No new irritative findings were detected, and the abnormalities were noted as probable residuals from previous surgery. The physical examination did not show any atrophy or weakness in the lower extremities. The deep tendon reflexes were active and equal. There was some tenderness of the lower back and left hip. Straight leg raising could be done to eighty-five degrees. Appellant's general health was reported as good.

On March 11, 1977, Dr. Fred Sanders, an orthopedic surgeon, examined appellant because of complaints of pain and discomfort in the low back and left leg. Appellant was described as well developed, well nourished, and alert and cooperative. He walked with a protective gait, but he was able to heel and toe walk satisfactorily. Range of motion of the lumbar spine was forty percent of normal. There was some tenderness of the low back. Examination of the reflexes demonstrated hyper-reflexia of the knee jerks and some mild depression of the left ankle jerk. X-ray of the lumbar spine revealed a fairly solid fusion. The diagnosis was persistent radiculitis.

On March 30, 1977, Dr. Ronald Smith, a neurological surgeon, examined appellant for complaints of pain and numbness in the lower back and left lower extremity. He also complained of some neck pain and intermittent dizziness. On examination the cranial nerves were intact. There was so definite limitation of motion of the cervical spine, but appellant complained of some discomfort on extremes of motion. There was some pain and discomfort on flexion of the lumbar spine, but not on rotation. Straight leg raising could be readily carried out to eighty-five degrees bilaterally. The doctor was unable to detect any muscular weakness in the extremities. There was hypoalgesia over the entire left foot and leg. X-rays showed that there was spondylolisthesis and marked narrowing of the lumbosacral interspace. The doctor's impression was that there was no objective evidence of any strong nerve root compression. An electromyogram performed on April 4, 1977, showed no nerve root irritation in the cervical, dorsal, or lumbar area.

On November 9, 1977, Dr. Farooq I. Selod, a specialist in physical medicine and rehabilitation, examined appellant with a chief complaint of constant, sharp low back pain radiating into the left leg and foot. Appellant also complained of nervousness and numbness in his arms. The examination revealed that appellant was able to remove his socks, while sitting, without difficulty. Examination of the back showed a normal gait, and a trendelenburg test was negative. Appellant was able to walk on his tiptoes and heel. Alignment of the dorsal and lumbar spine was normal. Flexion was carried out to fifty-five degrees, extension to ten degrees, rotation to sixty-five degrees bilaterally, and lateral bends to fifteen degrees on both sides. There was no pain on motion. There was some tenderness and muscle spasms in the dorsal and lumbar areas, but no tenderness was elicited in the hips or lower extremity. Circulation was normal in the lower extremity. On neurological examination there was hypesthesia on the left side; deep tendon reflexes were active and equal; and straight leg raising, sitting, was within normal limits with no pain elicited. Examination of the neck, shoulders, elbows, wrists, hands, hips, knees, ankles, and feet was within normal limits. X-rays of the back revealed a solid fusion without any motion, with some narrowing of L–5, S–1. The diagnosis was residuals of previous back surgery and strained muscles. The doctor opined that appellant could handle sitting jobs fairly satisfactorily with repetitive movement of the legs being avoided. He stated that appellant should have no problem using the upper extremities, and that he could work six to eight hours. (Record references omitted).