**Brenda MENEFEE, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 03–G–3393–S.**

United States District Court, N.D. Alabama, Southern Division.

Sept. 14, 2004.

Darryl W. Hunt, Clark & James LLC, Birmingham, AL, for Brenda Menefee, plaintiff.

Alice H. Martin, U.S. Attorney, Edward Q. Ragland, U.S. Attorney's Office, Birmingham, AL, Deanna L. Sokolski, Social Security Administration–Office of General Counsel, Atlanta, GA, for Jo Anne B. Barnhart, Commissioner of Social Security Administration, defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

Plaintiff brings this action pursuant to the provisions of section 205(g) of the Social Security Act, [hereinafter the Act], 42 U.S.C. § 405(g),[1] seeking judicial review of

---

**1.** 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for Supplemental Security Income [hereinafter SSI].

a final adverse decision of the Commissioner of Social Security [hereinafter Commissioner]. Application for a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act, as amended, was filed February 5, 2001, as was an application for SSI as provided under Section 1601 of the Act, 42 U.S.C. §§ 1381 *et seq.* These applications were denied initially and upon reconsideration. Request for a hearing before an administrative law judge [hereinafter ALJ] [Jack F. Ostrander] was granted, and a hearing was held July 8, 2002. The ALJ's decision to deny benefits was handed down October 25, 2002. Plaintiff's request for review by the Appeals Council was denied October 24, 2003. An appeal to this court followed.

Plaintiff is a 48 year old female with a high school education. Past relevant work is as a router and sorter for a uniform company (unskilled work at medium exertional level), supervisor in fast food industry (semi-skilled work at medium exertional level), and file clerk (very low end semi-skilled work at light exertional level). She last worked in August 1998 because of chronic and severe pain in her back, neck, and shoulder.

Ms. Menefee describes her pain as severe and constant. It is as if pins are sticking her. Pain affects her ability to sit, stand, and walk. She can sit for 10–15 minutes before having to change positions. She can stand for 10–15 minutes. She can walk about a block. She is able to lift a half gallon of milk. Pain is so severe she stays in bed most of he time. The constant pain affects her ability to concentrate. Her attention span is very short.

Plaintiff's treating physician is Dr. Walter Mauney. She testified she sees him every month or two. Dr. Mauney treats plaintiff at Community Care Plan at Pratt City. His notes of December 21, 2001, indicate low back pain which radiated down left leg. His notes of January 28, 2002, reference low back and neck pain. The MRI report (from Princeton) she brought indicates "pathology." May 3, 2002, notes reference her low back and neck pain.[2]

On August 14, 2002, Dr. Mauney completed a "Physical Capacities Evaluation [hereinafter PCE]" on plaintiff in which he opined she can lift 10 pounds occasionally or less frequently. In his opinion she is unable to sit, stand, or walk "0" hours during an eight hour work day.[3] She can occasionally perform push/pull movements, climb and balance, perform fine manipulation, bend, stoop, and reach. She is unable to work around hazardous machinery. There is no other complete PCE in the record.[4]

On the same date (August 14, 2002) Dr. Mauney completed a "Clinical Assessment of Pain" evaluation on plaintiff in which he opined her pain is present to such an extent as to be distracting to adequate performance of daily activities or work. Activity increases her pain to such an extent that bed rest and/or medication is necessary. Side effects from her medication may be present, but not to the degree as to create serious problems in most instances. He opined plaintiff has a medical condition consistent with the pain she experiences. This evaluation is uncontroverted.

Dr. Mauney additionally completed a "Clinical Assessment of Fatigue/Weak-

---

2. Many of his notes are illegible.

3. The ALJ discounted this opinion saying it was "totally" contrary to the medical evidence of record and the claimant's own testimony. He opined it was unclear whether he

was a treating physician. The ALJ gave "no weight to Dr. Mauney's opinion ...."

4. One-time consultant physician Alapati rendered a partial opinion which substantially differs. His opinion is found at 9–10.

ness" evaluation on plaintiff August 14, 2002, in which he opined that fatigue/weakness is "present to such an extent as to negatively affect adequate performance of daily activities or work." Physical activity increases fatigue/weakness to such an extent that bed rest and/or medication is necessary. Some side effects of pre-scribed medication may be present, but not to such a degree as to create serious problems in most instances. He opined she has a medical condition consistent with the fatigue/weakness she experiences. This evaluation is also uncontroverted.

As of July 1, 2002, plaintiff's medication included the following:

| Med | Prescribed | Daily Amt. | Reason | Physician |
|-----|-----------|-----------|--------|-----------|
| Lortab [5] | Sept. 2001 | 20–30 mg. | Pain | Dr. Kelsey |
| Lortab [6] | Sept. 2001 | 20–30 mg. | Pain | Dr. Mauney |
| Vioxx [7] | April 2002 | 10–20 mg. | Arthritis | Dr. T. Nell |
| Flexeril [8] | Sept. 2001 | 20–30 mg. | Muscle spasms | Dr. Mauney Dr. Kelsey |
| Bextra [9] | April 2002 | 10–20 mg. | Arthritis | Dr. T. Nell |
| Naproxen [10] | Dec. 2001 | 10 mg. | Arthritis | Dr. Mauney |
| Amitriptyline | Dec. 2001 | 25 mg. | Depression Nerves | Dr. Mauney |

5. Lortab tablets are indicated for the relief of moderate to moderately severe pain. The most frequently reported adverse reactions are lightheadedness, dizziness, sedation, nausea and vomiting. These effects seem to be more prominent in ambulatory than in non-ambulatory patients. *Physicians' Desk Reference*, (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR].

6. Lortab tablets are indicated for the relief of moderate to moderately severe pain. The most frequently reported adverse reactions are lightheadedness, dizziness, sedation, nausea and vomiting. These effects seem to be more prominent in ambulatory than in non-ambulatory patients. *Physicians' Desk Reference*, (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR].

7. Vioxx is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipryetic activities. It significantly reduces joint pain. Vioxx is indicated for the relief of the signs and symptoms of osteoarthritis, and for the management of acute pain in adults. *Physicians' Desk Reference*, (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR].

8. Flexeril relieves skeletal muscle spasm of local origin without interfering with muscle function. It is effective in muscle spasm due to central nervous disease. PDR.

Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculo-skeletal conditions. Improvement is manifested by relief of muscle spasm and its associated signs and symptoms, namely, pain, tenderness, limitation of motion, and restriction in activities of daily living. Flexeril may impair mental and/or physical abilities required for performance of hazardous tasks. Flexeril may enhance the effects of alcohol, barbiturates, and other CNS depressants. The most frequently reported adverse reactions are drowsiness, dry mouth, and dizziness. *Physicians' Desk Reference*, (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR].

9. Bextra provides powerful 24 hour relief of pain, inflammation, and stiffness of osteoarthritis and adult rheumatoid arthritis. *Bextra, at* http://www.bextra.com/are_you_new_to_bextra–48.asp (Visited September 12, 2004).

10. Naprosyn/naproxen (spelled both ways) is a nonsteroidal anti-inflammatory drug used to relieve the inflammation, swelling, stiffness, and joint pain associated with rheumatoid arthritis, juvenile arthritis, ankylosing spondylitis, tendinitis, bursitis, and acute gout. It is also used to relieve menstrual cramps and other types of mild to moderate pain. Ulcers and internal bleeding can occur without warning from use of this drug. Common side effects may include abdominal pain, bruising, constipation, difficult or labored breathing, dizziness, drowsiness, headache, heartburn,

Plaintiff was evaluated by Dr. Edwin Kelsey of Southeast Rehab Medicine on October 23, 2001. Her chief complaint was back pain, present for about five years. Left arm pain had been present about two weeks. His notes state that her primary care physician is Dr. Edwin Moyo who had referred her to Dr. Robert Johnson. Dr. Johnson had, in turn, referred plaintiff to him. Physical examination indicated flexion/extension of the LS spine revealed pain with forward flexion greater than 45 degrees from the erect position. Palpation of the lumbar spine elicited some tenderness in the lumbar region around L4/L5. X-rays of plaintiff's low back showed degenerative changes at the L4/L5 level. An MRI of the lumbar spine performed October 9, 2001, "showed a small disk bulge with lateralization to the left at L3/L4 causing some compromise of the neuroforamina on the left .... Also, premature degenerative changes were noted at the L4/L5 level and L5/S1." Dr. Kelsey's impression was chronic lower back pain secondary to advanced DJD (degenerative joint disease) of the LS spine. He set her up for an epidural block and P.T.

September 28, 2001, progress notes of Dr. Edwin Mayo (mentioned above at 6 as her primary physician) specifically state plaintiff had been his patient in the 1980's, but he had not seen her in some time. She came to him on that date complaining of back pain which radiated into her left leg. She had pain in her neck that radiated into her left arm. At the time of examination her lumbar sacral spine was tender to palpation and motion. She had a positive straight leg raise. His impression was lower back pain. He suspected disc

disease and felt that the neck and shoulder pain might be arthritic. Findings from a spine cervical routine he ordered showed some small anterior and posterior osteophytes and mininal disc space narrowing and some straightening of the normal cervical lordosis at C5–6. The interpretation by Dr. Edgar Underwood was mild degenerative changes of the C spine with possible mild muscle spasm manifested by straightening. Findings from the spine L–S routine showed a small anterior osteophyte off the anterior upper aspect of L4. Dr. Underwood's initial opinion was minimal degenerative changes. On further review he found straightening of the lordosis of the L spine which could be secondary to muscle spasm or positioning.

Findings on the MRI Dr. Moyo ordered showed mild disc bulging at C4–5. At C5–6 an asymmetric disc osteophyte complex to the right was causing some narrowing of the central canal and minimal encroachment on the right neuroforamen. In the lumbar spine area early degenerative changes of the disc space with some loss of signal were found at L3–4. There was a subtle disc bulge lateralizing to the left at L3–4 causing minimal compromise of the neuroforamen on the left. Early degenerative disc disease was present at L3–4.

Dr. Johnson (mentioned above at 6) of Haynes Neurosurgical Group saw plaintiff October 15, 2001. His working diagnosis was neck pain, left arm pain, and left leg pain. He reviewed the October 9, 2001, x-rays and MRI results. His assessment was chronic neck and back pain. He did not see any surgical problems in the imaging studies obtained and recommended plaintiff be seen by Dr. Kelsey.[11]

itching, nausea, ringing in ears, skin eruptions, and swelling due to fluid retention. *Naprosyn, available at* http://www.healthsquare.com/newrx/nap1283.HTM (last visited May 20, 2004).

**11.** In discussing Dr. Johnson's review of the x-rays and MRI the ALJ states the following: "Dr. Johnson copied doctors Moyo and Kelsey, who appear to be the claimant's treating physicians and not Dr. Mauney who did the residual functional capacity evaluation ay Ex-

Dr. Anjaneyula Alapati conducted a consultative examination on plaintiff on August 11, 2001. He found no evidence of any paravertebral muscle spasm, tenderness, crepitus, effusion, deformities, or trigger points. Pertinent portions of his report follow:

**DIAGNOSIS:** Chronic back pain, most likely secondary to degenerative lumbar spine disease with a positive straight leg raising test.

**DISCUSSION:** The claimant has been having chronic back pain since the time she worked at a uniform company. She also has radiating pain into the legs, mostly in the frontal distribution. . . .

On examination she had evidence of degenerative lumbar spine disease with a positive straight leg raise test which was most likely due to voluntary guarding. . . .

hibit 15F." See discussion at 6–8 about the Moyo/Kelsey/Johnson relationship. Plaintiff's lasting doctor/patient relationship dealing with her pain problems at hand was with Dr. Mauney. Dr. Moyo's testing confirmed the findings. His diagnosis is consistent with that of Dr. Mauney.

12. See Social Security Administration Program Operations Manual System (POMS). SSA POMS DI 32551.030, outlined, in part, below sets forth SSA's use of the terms "Occasionally" and "Frequently" in residual functioning:

As stated in DI 25001.001 B, the U.S. Department of Labor has incorporated into its classification of exertional requirements the following **definitions**:
- Sedentary work involves occasional lifting or carrying of articles like files, ledgers, and small tools, and occasional walking and standing;
- Light work involves **frequent** lifting or carrying of objects weighing up to 10 pounds;
- Medium work involves **frequent** lifting or carrying of objects weighing up to 25 pounds;
- Heavy work involves **frequent** lifting or carrying of objects weighing up to 50 pounds;

**FUNCTIONAL ASSESSMENT/MEDICAL SOURCE STATEMENT:** The number of hours the claimant would be expected to stand and walk in an eight-hour day would be limited to six hours with frequent [12] breaks secondary to her chronic back pain.

The number of hours the claimant could be expected to sit in an eight-hour work day is six hours with frequent breaks. This is because of her back pain.

The ALJ gave the above examination of Dr. Alapati "substantial weight" "because it was more consistent with the medical evidence of record of the treating physicians at Exhibits 7F (Johnson), 9F (Kelsey,)and 13F (Gaylon Rogers)." [13]

Based on the above record the ALJ found plaintiff is able to perform sedentary work,[14] requiring occasional standing, walking, carrying. His assessment that plaintiff is able to perform this work is not

- Very heavy work involves **frequent** lifting or carrying of objects weighing 50 pounds or more

In this job-related context:
"Occasionally" has the specific meaning of a range between very little and up to one-third of the time, depending on the requirements of a particular job.
"Frequently" has the specific meaning of a range between one-third and two-thirds of the time, depending on the requirements of a particular job.
. . .
The disability program meaning of "occasionally" and "frequently" is carried over to Form SSA–4734–F4 Residual Functional Capacity Assessment.

13. Dr. Rogers wrote an April 5, 1994, return to work slip following lumbar strain.

14. A discussion of "DETERMINING CAPABILITY TO DO OTHER WORK—THE MEDICAL–VOCATIONAL RULES OF APPENDIX 2" is found in SSR 83–10. Authority for the material in SSR 83–10 is found in Sections 223(d)(2)(A) and 1614(a)(3)(B) of the Social Security Act; Regulations No. 4, Subpart P, sections 404.1505(a), 404.1520(f)(1), 404.1545, 404.1560–404.1561, 404.1563–404.1569, and Appendix 2; and Regulations No. 16, Subpart 1, sections 416.905(a), 416.920(f)(1), 416.945, 416.960–416.961, and

consistent with the assessment of Dr. Alapati or of plaintiff's treating physician.

■■■ "The function of a reviewing court is limited to determining whether the Secretary's findings are supported by substantial evidence considering the evidence as a whole." *Mims v. Califano,* 581 F.2d 1211, 1213 (5th Cir.1978). "Substantial evidence is more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 852 (1971). The court is still responsible for scrutinizing " 'the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding.' " *Boyd v. Heckler,* 704 F.2d 1207, 1209 (11th Cir.1983) (quoting *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982)). The Eleventh Circuit has gone on to state the following:

> Our limited review does not, however, mean automatic affirmance, for although we defer to both the Secretary's factfinding and her policy judgments, we must still make certain that she has exercised reasoned decision making. To

this end, we evaluate the Secretary's findings in light of the entire record, not only that evidence which supports her position.

*Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984).

■■■ The court must further consider whether the decision of the Commissioner contains a material error of law. In *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987), the court held:

> Despite this limited review, we scrutinize the record in its entirety to determine the reasonableness of the secretary's factual findings. *Bridges,* 815 F.2d at 624; *Arnold v. Heckler,* 732 F.2d 881, 883 (11th Cir.1984). No similar presumption of validity attaches to the Secretary's legal conclusions, including determination of the proper standards to be applied in evaluating claims. *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 (11th Cir.1982).

■■■ Having evaluated the evidence, the court holds that substantial evidence does not support the decision denying disability benefits. Improper legal standards were applied.

> 1) The ALJ failed to follow the pain standard set by the Eleventh Circuit; [15]

416.963–416.969. Under the Glossary sedentary work is defined in the following manner:
1. *Sedentary work.* The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

"Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

15. Whenever a claimant asserts disability through testimony of pain or other subjective symptoms, the Eleventh Circuit standard requires:

2) The ALJ failed to give proper weight to the opinion of plaintiff's treating physician;[16]

3) The ALJ placed improper weight to the opinion of the one-time consulting physician.[17]

4) The ALJ improperly held that plaintiff is able to perform sedentary work, relying on the evaluation of the consulting physician.[18, 19]

> 1. evidence of an underlying medical condition and either
> 2. objective medical evidence confirming the severity of the alleged pain arising from that condition or
> 3. that the objectively determined medical condition is of such severity that it can reasonably be expected to cause the alleged pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991). See also *Elam v. Railroad Retirement Board*, 921 F.2d 1210, 1215 (11th Cir. 1991); *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir.1988); *Hand v. Heckler*, 761 F.2d 1545, 1548 (11th Cir.1985).

More recently, in *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir.2002), the court announced the pain standard as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

In *Brown v. Sullivan*, 921 F.2d 1233 (11th Cir.1991), the court said:

> The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir.1987); *MacGregor*, 786 F.2d at 1054; *Landry*, 782 F.2d at 1152. If the Secretary decides not to credit such testimony, he must discredit it explicitly, *MacGregor* at 1054, and articulate explicit and adequate reasons for doing so. *Hale*, 831 F.2d at 1011. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir.1988); *Hale*, at 1011; *MacGregor*, at 1054.

*Brown v. Sullivan*, 921 F.2d at 1236. As in *Brown*, Ms. Menefee's subjective testimony in the present case is well supported by objective medical evidence (x-rays, MRI, tenderness, muscle spasms) of degenerative disc disease of the lumbar spine, DJD of LS spine, and degeneration of C spine—underlying conditions which could reasonably be expected to produce her pain. The medical evidence establishes that claimant's pain testimony is credible. She has suffered and continues to suffer with pain. The ALJ's failure to articulate explicit and adequate reasons for rejecting this testimony requires that it be accepted as true. *Brown v. Sullivan*, 921 F.2d at 1236 (citing *Hale v. Bowen*, 831 F.2d at 1011). The court rejects the ALJ's attempt to discredit her testimony.

**16.** While the opinions of physicians are not determinative of the issue of disability, 20 C.F.R. § 404.1526 (1995), the law is clear that the ALJ must give substantial weight "to the opinion, diagnosis, and medical evidence of the claimant's treating physician." *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir.1982); *Smith v. Schweiker*, 646 F.2d 1075 (5th Cir. 1981). The Eleventh Circuit has gone further to hold that where the Secretary ignores or fails to properly refute a treating physician's report, the findings in that report are to be accepted as true as a matter of law. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The Secretary must give "explicit and adequate reasons for rejecting the opinion of the treating physician." *Elam v. Railroad Retirement Board*, 921 F.2d 1210, 1215 (11th Cir.1991). The ALJ has failed to satisfy this requirement.

**17.** The regulations give preference to the opinion of the treating physician. 20 C.F.R. § 404.1527(d)(2). *See Lewis v. Callahan*, 125 F.3d 1436 (11th Cir.1997) ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.") (citing *MacGregor*, 786 F.2d at 1053). The court has outlined in the opinion why the ALJ's reasoning is faulty and his conclusion inaccurate.

**18.** See n.11 at 11 and n.9 at 9. Plaintiff is unable to fulfill the requirements set by the ALJ. The requirements he set abiding by the

For the reasons set forth above the court HOLDS that the decision of the Commissioner is REVERSED. An order consistent with this opinion is being entered contemporaneously herewith.

### FINAL ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of Social Security be and it hereby is REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be granted the benefits claimed.

It is FURTHER ORDERED that the Commissioner withhold from payments which he may determine are due plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of section 206 of the Social Security Act, as amended 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fees to be allowed plaintiff's counsel for services rendered in representing the plaintiff in this cause.

It is FURTHER ORDERED that pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby GRANTED an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for* *attorney's fees under the Equal Access to Justice Act.*

limitations set by the consulting physician do not meet the requirements of sedentary work.

**19.** The consultant's assessment is not consistent with the ALJ's opinion and is certainly contradictory to that of treating physician Mauney.