**Martha KING o/b/o Thomas King, Plaintiff,**

v.

**Larry G. MASSANARI, Commissioner of Social Security, Defendant.**

**No. CIVA. 00–G–2527–NE.**

United States District Court, N.D. Alabama, Northeastern Division.

July 5, 2001.

James W. Ezell, Auffenorde & Auffenorde PC, Huntsville, AL, for Plaintiff.

Edward O. Ragland, Asst. U.S. Atty., U.S. Attorney's Office, Birmingham, AL, Anita K. Brotherton, Social Security Administration Office of General Counsel, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

Plaintiff's mother brings this action on behalf of claimant pursuant to the provisions of section 205(g) of the Social Security Act, [hereinafter the Act], 42 U.S.C.

§ 405(g),[1] seeking judicial review of a final adverse decision of the Commissioner of Social Security [hereinafter Commissioner]. Application for SSI income as provided under Section 1601 of the Act, 42 U.S.C. §§ 1381 *et seq.* was filed March 16, 1998. This application was denied initially and upon reconsideration. Request for hearing before an administrative law judge [hereinafter ALJ] was granted, and a hearing was held April 9, 1999. The ALJ's decision to deny benefits was handed down July 19, 1999. Plaintiff's request for review by the Appeals Council was denied July 12, 2000. An appeal to this court followed.

Plaintiff is a fourteen year old child, eleven at the time his application for SSI was filed. He has been treated by five professionals for bipolar disorder: psychiatrist Dr. Trevor Lindsay, psychiatrist Dr. Andrew Wilkerson, and licensed therapists Wilhelmina Cox, Paige Smith, and William Heard. His onset date of disability is June 1, 1989.

Plaintiff was admitted to the inpatient psychiatry unit of Decatur General West on February 24, 1998, with an admitting diagnosis of Depressive Disorder, unspecified.[2] Attention Deficit Hyperactivity Disorder [3] was ruled out at the time of admission. Admission was by referral from the Huntsville–Madison County Mental Health Center [hereinafter Mental Health Center] [4] for evaluation of suicide threats. Treating physician Dr. Wilkerson wrote a detailed discharge summary. It was clear claimant was suffering from deficits of self esteem. Stated mood was "depressed," but the patient said he felt better since he was not in school. The doctor found no evidence of homicidal ideation. There was no evidence of psychosis.

The patient was administered a battery of psychological tests on February 25, 1998: Million Adolescent Personality Inventory, Bender–Gestalt, Sentence Completion Test, Draw–A–Person Test, Adolescent Personality Inventory, Thematic Apperception Test, Personal Problems Check List for Adolescents, and a clinical interview. Based on the tests the likely diagnoses reached were as follows:

1) Major depression, without psychotic features.[5] 2) Adjustment disorder with

---

1. 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for Supplemental Security Income [hereinafter SSI].

2. This category includes disorders with depressive features that do not meet the criteria for Major Disorders of other types. The clinician has concluded that a depressive disorder is present but is unable to determine whether it is primary, due to a general medical condition, or substance induced (not case with plaintiff). *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association 4th ed.1994) [hereinafter DSM–IV].

3. The essential feature of Attention–Deficit/Hyeractivity Disorder is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development. Some symptoms must have been present before age seven. DSM–IV.

4. The patient had been in therapy in the Mental Health Center since January 1995. Some of his treatment had been in helping him deal with the emotional aftermath of his mother's mental illness and hospitalizations. She suffers with Bipolar Disorder.

5. Five or more of the following symptoms have been present during the same two-week period and represent a change from previous functioning: depressed mood most of day, nearly every day (in children can be irritable mood); markedly diminished interest of pleasure in all, or almost all activities most of the day; significant weight loss or gain; insomnia or hypersomnia every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy; feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concen-

mixed emotional features.[6] 3) Child-parent problem. 4) Possible attention deficit hyperactivity disorder. 5) Avoidant and dependent personality features.[7]

Results of the Wechsler Intelligence Scale for Children [hereinafter WISC–III], Test of Variables of Attention [TOVA] and a Kaufman Test of Educational Achievement (comprehensive form) [hereinafter Kaufman] showed the patient's verbal IQ to be 111, performance IQ to be 133, and full scale IQ to be 123.

Although it was recommended that the patient remain in the hospital, both the patient and his mother wanted him discharged on March 3, 1998, at which time he was discharged to his home and to his mother. Follow-up was to be conducted at the Mental Health Center. It was recommended that he see a doctor specializing in sleep medicine. The discharge diagnosis follows:

1. Major depression,[8] single episode,[9] moderate to severe without psychotic features.

2. Attention deficit hyperactivity disorder.

3. Avoidant-dependent personality traits.

Dr. Wilkerson referred his patient to psychologist John R. Haney for psychological evaluation to provide diagnostic information and baseline data regarding the social and emotional functioning of plaintiff. Tests given were Million Adolescent Personality Inventory, Bender–Gestalt, Sentence Completion Test, Draw–A–Person Test, Adolescent Personality Inventory, Thematic Apperception Test, Personal Problems Check List for Adolescents, and a clinical review. The Million Adolescent Personality Inventory suggested the patient did not respond to the personal inquiry in a fully reliable manner. Under the Personal Problems Check List for Adoles-

trate, or indecisiveness; and recurrent thoughts of death, recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide. DSM–IV.

6. The essential feature of an Adjustment Disorder is the development of clinically emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors. DSM–IV.

7. The essential feature of Avoidant Personality Disorder is a pervasive pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation that begins before adulthood and is present in a variety of contexts. The disorder is often diagnosed with Dependent Personality Disorder because these individuals become very attached to and dependent on those few other people with whom they are friends. These people are fearful and may elicit ridicule (as does plaintiff). They have self doubts, are anxious, shy, lonely, isolated, and have low self-esteem. Major problems occur in social functioning. DSM–IV.

8. The essential feature of Major Depressive Disorder is a clinical course characterized by one or more Major Depressive Episodes without a history of Manic, Mixed, or Hypomanic Episodes. A Major Depressive Disorder is associated with high mortality. Up to 15% of individuals with this disorder die by suicide. Other mental disorders frequently co-occur with Major Depressive Disorder. Approximately 50%—60% of individuals with Major Depressive Disorder, Single Episode can be expected to have a second episode. Individuals who have had two episodes have a 70 % chance of having a third and individuals who have had three episodes have a 90% chance of having a fourth. About 5%—10% of individuals with Major Depressive Disorder, Single Episode, subsequently develop a Manic Episode (i.e. Bipolar I Disorder), as did plaintiff in the case at bar. DSM–IV.

9. Presence of a single Major Depressive Episode. DSM–IV.

cents plaintiff indicated the following as shown by the doctor's summary:

"not getting along with other people, feeling lonely, like people are against him, pressure to do the wrong thing, being overweight, unattractive, clumsy and awkward, getting bad grades, having a poor attitude toward self. He endorsed such emotional problems as feeling sad and depressed, having the same thoughts over and over again, having trouble concentrating, thinking too much about death, being afraid of hurting self, feeling out of control, not being able to sleep and having thoughts of suicide."

The psychologist penned a detailed evaluation for Dr. Wilkerson, portions of which follow:

This youngster is characteristically apprehensive, fearful, and lacks a sense of identity, and is markedly depreciating of self worth. He displays a general social over-sensitivity, awkwardness, shyness and hesitation with peers and a discomfort about family relationships. He does desire closeness and affection, but these are self protectively denied or restrained. He is often sad, feels friendless at times, experiences recurrent anxieties about school work and feels pervasive disharmony of mood, much of the time. Rarely does he act out or become overly resentful. He is over concerned with social rebuff, a wor-

ry that is often intensified by his tendency to anticipate and elicit rejection, particularly from peers and family members.

. . .

Thomas lacks a clear self image and his view of himself as weak, fragile and ineffectual will make ordinary distresses and responsibilities often seem excessively demanding. This passive life style may stem also from a temperamental apathy, ease of fatigue, and low energy level. Particularly noteworthy is the fact that he is frequently self absorbed and lost in daydreams that occasionally may blur fantasy with reality . . . .

. . .

TAT stories were reasonably complete and well thought out. . . . Most of his perceptions were quite dysphoric and projected a wide range of fears that included anticipation of rejection by others, suicide thoughts and social alienation. . . .

Psychometrist Donna Houston examined plaintiff February 26, 1998, upon the referral of Dr. Wilkerson. She administered WISC–III, TOVA,[10] and Kaufman.[11] On the WISC–III Thomas scored a verbal IQ of 111, a performance IQ[12] of 133 and a full scale IQ of 123.[13] TOVA test results were not within normal limits and were suggestive of an attentional deficit. On the Kaufman test plaintiff obtained a stan-

---

**10.** Well validated and reliable neuropsychological test specifically developed for use in screening and diagnosing the treatment of neurologically-based attentional deficits in children and adults. Houston PSYCHOEDU-CATIONAL EVALUATION [hereinafter Houston evaluation] prepared for Dr. Wilkerson. [R.186].

**11.** An individually administered test of academic achievement.

**12.** Indicates how well the youngster did on tasks that required examining and thinking

about things such as designs, pictures, and puzzles and to solve problems without using words. Houston evaluation [R. 185].

**13.** Indicates Superior general intellectual functioning—94th percentile. The examiner believed this to be a valid assessment. The WISC–III Full Scale score is one way to view overall thinking and reasoning skills. Guidelines set forth in WISC–III manual according to Houston evaluation. [R. 184].

dard score of 100 where the mean is 100 and the standard deviation is 15. His overall test score was average.

Ms. Houston's report closed with the following conclusion:

These results indicate that Chris [14] is functioning within the Superior range of intelligence with Very Superior skills in nonverbal reasoning and visual-motor-perceptual and spatial skills and High Average skills in verbal expression and comprehension. Chris' academic achievement was above average in reading, but only average in spelling and math. One might expect better developed skills in spelling and math considering his IQ. In fact, though in the average range, a "severe discrepancy" exists in those areas. Chris also demonstrates characteristics associated with an Attention Deficit Hyperactive Disorder, predominately combined type. This might

explain the discrepancy or he might have a coexisting learning disability in these areas.

The examiner recommended that plaintiff be included in the "504" services.[15]

Dr. Trevor R. Lindsay, staff psychiatrist at Huntsville–Madison County Mental Health Center assessed plaintiff's condition on May 6, 1998, and June 3, 1998. In the June assessment the doctor changed his May diagnosis of Attention Deficit Hyperactive Disorder to Bipolar Disorder, mixed.[16, 17] A June 6, 1999, assessment by the doctor was consistent with the June 3, 1998, assessment: Bipolar Disorder, mixed, with Attention Deficit Hyperactive Disorder ruled out. By the November 4, 1998, assessment the doctor's assessment read: "Bipolar Disorder, mixed. Present episode hypomanic,[18] improving. Rule out Attention Deficit Hyperactive Disorder as

14. The plaintiff Thomas Christopher King asked to be called Chris instead of Thomas—hence the difference used in names in evaluations.

15. Section 504 of the Rehabilitation Act of 1973 [hereinafter Section 504]. "Any pupil who has a temporary or permanent mental or physical impairment; has a record of such an impairment; or is regarded as having an impairment which substantially limits one or more of their major life activities is disabled/handicapped under Section 504.... It should be emphasized that a physical or mental impairment does not constitute a disability for the purposes of Section 504 unless its severity is such that it results in a substantial limitation of one or more of the major life activities." Section 504 Definition of "DISABLED/HANDICAPPED."

16. On September 20, 1996, Dr. Lindsay diagnosed plaintiff as suffering from Oppositional Defiant Disorder (pattern of negativistic, hostile, and defiant behavior which causes significant impairment in social functioning—loses temper, argues with adults—refuses to comply with adults' requests or rules—angry and resentful (DSM–IV)) and Attention Deficit Hyperactive Disorder, diagnoses confirmed on November 7, 1996. The doctor diagnosed

plaintiff as suffering from Bipolar Disorder (alternating manic and depressive periods) for the first time on January 3, 1997, at which time he recommended weekly family therapy.

17. A Bipolar Disorder, Mixed, is a clinical course characterized by the occurrence of one or more Manic Episodes or Mixed Episodes. A Mixed Episode is characterized by a period of time (lasting at least one week) in which the criteria are met both for a Manic Episode and for a Major Depressive Episode nearly every day. The individual experiences rapidly alternating moods (sadness, irritability, euphoria) accompanied by symptoms of a Manic Episode and a Major Depressive Episode. The symptom presentation frequently includes agitation, insomnia, appetite dysregulation, psychotic features, and suicidal thinking. The mood disturbance is sufficiently severe to cause marked impairment in relationships with others. DSM–IV.

18. A distinct period of persistently elevated, expansive, or irritable mood, lasting throughout at least four days, that is clearly different from the usual nondepressed mood. DSM–IV.

a co-morbid diagnosis." On the September 14, 1998, assessment the doctor indicated that therapist Paige Smith had noted an escalation in Chris's mood. "He had grabbed his mother by the throat, used a pen to stab at the walls, shouted and threatened to hurt his therapist at her latest session. He has been continuously fussing with his mother." There was no change in diagnosis.

At the direction of the state disability determination agency a childhood disability evaluation form was completed June 15, 1998, by T. Michael Hammond, Ph.D.. Major depression and parent-child problems were listed problems. Dr. Hammond rated plaintiff's impairment as severe, but not of the severity of a Listing. Another childhood disability evaluation dated August 24, 1998, by P. Fleece, Ph.D.. rated claimant in the same manner. **Neither consultant examined the claimant.**

The record is filled with individual therapy notes running into 1999, all indicating recurrent behavioral and mental problems. A few illustrative remarks from those sessions follow:

1) August 25, 1998, meeting with Ms. Smith: King admitted to having "'strangled' a girl at school"—said negative things about self—plaintiff had "angry, hostile" affect, rolling eyes—plaintiff refused to answer any questions—mood swings;

2) October 12, 1998, meeting with Ms. Smith: "angry" affect—plaintiff still wetting bed almost nightly—frequently interrupts mother—voiced hatred of his life and belief he would be better off dead;

3) November 11, 1998, meeting with Mr. Heard [19]: "anxious" affect—sad/depressed—negative self image—low self-esteem—nightly bed wetting—suicide threat;

4) November 16, 1998, meeting with Mr. Heard: threatening to commit suicide—inappropriate behavior—low self-esteem—placed in detention after fight at school—anxious;

5) November 23, 1998, meeting with Mr. Heard: "flat" affect—"interpersonal conflict" with adults and peers—defiant behavior—low self-esteem—being placed in In–School Suspension and having to meet "special education coordinator" daily for "social skills training—negative mood—cries—lies to mother";

6) December 11, 1998, meeting with Mr. Heard: low self-esteem—thoughts of suicide—felt bad outweighed the good in life;

7) December 21, 1998, meeting with Mr. Heard: experiencing interpersonal conflict—self-esteem issues—felt unacceptable by peers;

8) January 4, 1999, meeting with Mr. Heard: self-esteem issues—apprehensive about returning to school:

9) January 21, 1999, meeting with Mr. Heard: low self-esteem—sad—trouble at school—had attempted to put fork down throat and made gestures of wanting to kill himself—defiant behavior at home—refusal to do homework;

10) February 3, 1999, meeting with Mr. Heard: low self-esteem——negative peer relations;

11) February 10, 1999, meeting with Mr. Heard: low self-esteem—depressed mood;

12) February 17, 1999, meeting with Mr. Heard: low self-esteem—depressed

**19.** Plaintiff was switched to a male therapist after threatening life of Ms. Smith.

mood—nothing helps problems—cause of others bothering him;

13) February 19, 1999, crisis meeting with Mr. Heard: following threat to kill self—appeared frustrated—often sad;

14) February 24, 1999, meeting with Mr. Heard: low self-esteem—received an "F'" in school—defiant behavior—disobeyed rules at school; and

15) March 3, 1999, meeting with Mr. Heard: suicide threats—low self-esteem.

From the record the ALJ determined that the claimant has a depressive disorder which meets the definition of severe, but that he does not meet the requirements for benefits.

■ "The function of a reviewing court is limited to determining whether the Secretary's findings are supported by substantial evidence considering the evidence as a whole." *Mims v. Califano,* 581 F.2d 1211, 1213 (5th Cir.1978). "Substantial evidence is more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 852 (1971). The court is still responsible for scrutinizing " 'the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding.' " *Boyd v. Heckler,* 704 F.2d 1207, 1209 (11th Cir.1983) (quoting *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982)). The Eleventh Circuit has gone on to state the following:

Our limited review does not, however, mean automatic affirmance, for although we defer to both the Secretary's fact-finding and her policy judgments, we must still make certain that she has exercised reasoned decision making. To this end, we evaluate the Secretary's findings in light of the entire record, not only that evidence which supports her position.

*Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984).

■ The court must further consider whether the decision of the Commissioner contains a material error of law. In *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987), the court held:

Despite this limited review, we scrutinize the record in its entirety to determine the reasonableness of the secretary's factual findings. *Bridges,* 815 F.2d at 624; *Arnold v. Heckler,* 732 F.2d 881, 883 (11th Cir.1984). No similar presumption of validity attaches to the Secretary's legal conclusions, including determination of the proper standards to be applied in evaluating claims. *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 (11th Cir.1982).

■ Having evaluated the evidence, the court holds that the evidence does not support the decision denying disability benefits. Improper legal standards were applied.

The ALJ found that plaintiff did not meet the requirements of 20 CFR 416.924(a)—(d), considered when the severity of the impairment does not meet or equal any of the listings in Appendix 1 of Subpart P of Part 404. In the case at bar, however, plaintiff does meet the requirements of 20 CFR Ch III, Pt. 404, Subpt. P, App. 1, 12.04 *Affective Disorders,* set forth in part below:

12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole

psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following;

. . .

b. Appetite disturbance with change in weight; [20] or

c. Sleep disturbance;

. . .

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide

. . .

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes):

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

. . .

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (**which may include deterioration of adaptive behaviors**)( emphasis added).

■ Plaintiff has been treated by more than five professionals for bipolar disorder.[21] The ALJ has stated no reason for not considering the opinion of treating psychiatrists Dr. Trevor Lindsay and Dr. Andrew Wilkerson and the therapists who have worked with him over the years. The opinions of treating physicians must be given controlling weight under 20 CFR § 416.927(d)(2). These physicians have obtained "longitudinal picture(s) of [the] impairment." 20 CFR § 416.927(d)(2)(I). They have ordered tests and had consultative examinations performed to satisfy the requirement of 20 CFR § 416.927(d)(2)(ii). *See Lewis v. Callahan,* 125 F.3d 1436 (11th Cir.1997) (In determining whether claimant is entitled to social security disability benefits, testimony of treating physician must be given substantial or considerable weight unless good cause is shown to contrary); *Wiggins v. Schweiker,* 679 F.2d 1387 (11th Cir.1982) (The law is clear that the ALJ must give substantial weight "to the opinion, diagnosis, and medical evidence of the claimant's treating physician."). *See also Walker v. Bowen,* 826 F.2d 996(11th Cir.1987); *Smith v. Schweiker,* 646 F.2d 1075 (5th Cir.1981). The Eleventh Circuit has gone further to hold that where the Secretary ignores or fails to properly refute a treating physician's report, the findings in that report are to be accepted as true as a matter of law. *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir.1986). The Secretary must give "explicit and adequate reasons for rejecting the opinion of the treating physi-

---

**20.** Plaintiff is grossly overweight. There are many references to his weight problem.

**21.** He has additionally been evaluated by psychometrist Donna Houston at the request of Dr. Wilkerson. Her remarks appear on 7–8.

cian." *Elam v. Railroad Retirement Board,* 921 F.2d 1210, 1215 (11th Cir.1991).

 Since the ALJ failed to accord substantial weight to the opinion of treating physicians Wilkerson and Lindsay—opinions based on cumulative observations and examinations, substantiated by medical tests, and consultative examinations—and failed to state a good cause for not doing so, (*Broughton v. Heckler,* 776 F.2d 960, 961–62 (11th Cir.1985) (per curiam)), based on the record as set forth above, the court holds that the opinion of the Commissioner denying benefits should be reversed. Plaintiff qualifies for benefits under 12.04. The plaintiff has been diagnosed by his treating physicians with Major Depression, Adjustment Disorder, child-parent problem, Avoidant and Dependent Personality features, Oppositional Defiant Disorder, and Bipolar Disorder. The record is void of any testimony by physicians to the contrary. Because of his condition he is unable to get along with adults or his peers. He feels lonely, sad, depressed, out of control, anxious, apprehensive, fearful. He is unable to sleep, has trouble concentrating, and has thoughts of suicide. He has mood swings, fatigue, and low energy levels. He has become a threat to himself (suicide ideation) and to others (attacks on mother and therapist). He has no friends and is unable to relate to adults or his peers. Rather than being able to reconcile conflicts with peers, his mother or adults outside the family, his defiant behavior escalates, as do the conflicts. He attacks physically. He is unable to adapt to his environment and shows no respect for others.

Since plaintiff clearly meets the requirements set forth by the Listings he is entitled to benefits. The decision of the Commissioner is REVERSED. An order consistent with this opinion is being entered contemporaneously herewith.

*ORDER*

In conformity with and pursuant to the memorandum opinion entered contemporaneously, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of Social Security be and it hereby is REVERSED, and the case is remanded TO THE Commissioner with instructions that the plaintiff be granted the benefits claimed.