**Charles LACY, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A. 03–G–0549–NE.**

United States District Court, N.D. Alabama, Northeastern Division.

March 16, 2004.

---

James P. Frey, Jr., James P. Frey, Jr. PC, Vincent, AL, for Charles A Lacy, plaintiff.

Alice H. Martin, U.S. Attorney, Edward Q. Ragland, U.S. Attorney's Office, Bir-

mingham, AL, Mary Ann Sloan, Social Security Administration–Office of General Counsel, Atlanta, GA, for Jo Anne B. Barnhart, Commissioner of Social Security Administration, defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

Plaintiff brings this action pursuant to the provisions of section 205(g) of the Social Security Act, [hereinafter the Act], 42 U.S.C. § 405(g),[1] seeking judicial review of a final adverse decision of the Commissioner of Social Security [hereinafter Commissioner]. Application for a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act, as amended, was filed June 29, 1997, as was an application for SSI as provided under Section 1601 of the Act, 42 U.S.C. §§ 1381 *et seq.* These applications were denied initially and upon reconsideration. Request for a hearing before an administrative law judge [hereinafter ALJ] [Jerry M. Vanderhoef] was granted, and a hearing was held March 23, 1999. The ALJ's decision to deny benefits was handed down July 9, 1999. Although new evidence was submitted to the Appeals Council plaintiff's request for review was denied January 3, 2003. An appeal to this court followed.

Plaintiff is a 51 year old male with an eighth grade education. Past relevant work is as a janitor, landscaper, construction laborer, and cook. He has not been engaged in any relevant work since claimed disability onset of June 29, 1997— a date later amended to August 14, 1997. Mr. Lacy claims disability due to panic attacks[2] and side effects of medication.

---

1. 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for Supplemental Security Income [hereinafter SSI].

2. A panic attack involves the sudden onset of at least 4 of 13 symptoms: chest pain or discomfort; choking; dizziness, unsteady feelings, or faintness; fear of dying; fear of going crazy or of losing control; feelings of unreality, strangeness, or detachment from the environment; flushes or chills; nausea or abdominal distress; numbness or tingling

Plaintiff has been treated for many medical problems covering everything from knee pain, cardiac arrythmia, anxiety, depression, etc. While these problems are significant and play a role in his disability the court is basically limiting its opinion to two areas: his panic disorder [3,4] and the side effects of his medication.

Dr. Sadaat Ansari treated plaintiff four times from June 16, 1997, through July 14, 1998. His notes indicate treatment for panic disorder. Plaintiff was feeling sleepy with Xanax.[5] He tapered off the Xanax and prescribed Buspar.[6] The doctor referred plaintiff to the Mental Health Center.

Mr. Lacy was treated in the Huntsville Hospital Emergency Room [hereinafter Huntsville ER] in June 1997 for chest pain and hyperventilation Xanax was prescribed. Treatment for other panic attack symptoms follows:

1) September 6, 1997: Huntsville ER—shortness of breath;

2) October 8, 1997: assessment by Dr. Edward Turpin, psychiatrist of panic disorder without agoraphobia [7]—possible alcohol abuse—global assessment of functioning [GAF] level of 60; [8*]

sensations; palpitations or accelerated heart rate; shortness of breath; sweating; and trembling or shaking. The disorder results from both biologic and psychologic dysfunction and pharmacotherapy and behavior therapy usually help control symptoms. *The Merck Manual of Diagnosis and Therapy* 1513–15 (Mark H. Beers and Robert Berkow, eds 17th ed.1999).

3. The essential feature of panic disorder is the presence of recurrent, unexpected panic attacks followed by at least one month of persistent concern about having another panic attack, worry about the possible implications or consequences of the panic attack, or a significant behavioral change related to the attacks. *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association 4th ed.1994) [hereinafter DSM–IV].

4. Instances of episodes with his heart will be discussed in so far as they are symptoms of a panic attack or panic disorder.

5. Xanax (alprazolan) is indicated for the management of anxiety disorder (a condition corresponding most closely to the APA Diagnostic and Statistical Manual diagnosis of generalized anxiety disorder) or the short-term relief of symptoms of anxiety. It can cause drowsiness or light-headedness. *Physicians' Desk Reference* (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR]. Xanax is in the benzodiazapine class of central nervous system active compounds. Adverse reactions include drowsiness and light-headedness. Less common side effects may include headache, confusion, restlessness, psychosis, transient hypotension, tachycardia, dry mouth, nausea and vomiting, constipation and visual disturbances.

6. BuSpar (Buspirone) is an anxiety agent that is not chemically or pharmacologically related to the benzodiazepines, barbiturates, or other sedative/anxiolytic drugs. *BuSpar, at* http://www.rxlist.com/cgi/generic/buspar.htm (March 3, 2004). Commonly observed side effects include dizziness, nausea, headache, nervousness, lightheadedness, and excitement. *Buspar Side Effects, Interactions, Reactions, Pediatric, Geriatric, at* http://www.rxlist.com/egi/genric/buspar_ad.htm (March 3, 2004).

7. Agoraphobia occurs in the context of panic disorder with agoraphobia and panic disorder without agoraphobia. The essential feature of agoraphobia is anxiety about being in places or situations from which escape might be difficult (or embarrassing) or in which help may not be available in the event of having a panic attack or panic-like symptoms. The anxiety typically leads to a pervasive avoidance of a variety of situations that may include being alone outside the home or being home alone; being in a crowd of people; traveling in an automobile, bus, or airplane; or being on a bridge or in an elevator. DSM–IV.

8. **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occu-**

3) December 12, 1997: Huntsville ER—shortness of breath;

4) January 6, 1998: Huntsville ER—chest pain, nausea, excitement—out of Xanax;

5) March 1998: treatment (twice) by psychologist Dr. Robert L. Geist for panic attacks [9]—rapid breathing, racing heart, shaking hands—diagnosis panic disorder;

6) April 8, 1998, psychological evaluation by William McDonald, PhD: assessment Panic disorder With Agoraphobia—difficulty remembering dates from past—affect somewhat restricted—quite restless—insight and judgment somewhat limited due to intellectual limitations. July 7, 1998: Huntsville ER—treatment irregular heart beats and chest pain;

7) July 7, 1998: Huntsville ER—treatment irregular heart beats and chest pain:

8) July 21, 1998: consultation Dr. S. Reddy Karri of Alabama Cardiology at request of Dr. Ansari for chest pain and shortness of breath—probably not cardiac related;

9) June 4, 1999, consultative evaluation by Dr. Sadasiva H. Katta of Alabama Cardiology for chest pains and palpitations—dizziness, shortness of breath, weakness, diaphoresis—impression atypical chest pain with palpitations—mitral valve possible contributor to panic attacks—Holter monitor;

Psychiatrist Dr. Hugh Sharp began treating plaintiff for his panic attacks beginning March 14, 1998. The doctor noted the attacks began in 1997. At the time of the first examination plaintiff was somewhat anxious with rapid speech and tremulous motor movements. Plaintiff expressed feelings of hopelessness, chronic low level anxiety, some withdrawal but no agoraphobia.[10] The doctor concluded plaintiff self-medicated with caffeine and alcohol. He adjusted claimant's medications, recommended he return every three months **or as needed due to finances,**[11] and decrease use of ethanol.

Three months later Dr. Sharp concluded the panic disorder was unimproved. Plaintiff was taking Xanax, Depakote,[12] and Paxil.[13] On June 13, 1998, the doctor noted plaintiff was having side effects from medication. He was queasy and shaky on Paxil. Lacy's affect was reactive and anxious. His mood was euthymic. Insight and judgment were fair. Plaintiff "[s]till jerks and kicks" at night and wakes up in a panic. The doctor discontinued use of

pational, or school functioning** (e.g., few friends, conflicts with peers or co-workers). DSM–IV.

**9.** The attacks had been occurring several times a week for six months.

**10.** Dr. Sharp later diagnosed panic disorder with agoraphobia.

**11.** This notation indicates the doctor's awareness that treatment would be limited due to plaintiff's financial condition.

**12.** Depakote is indicated for treatment of the manic episodes associated with bipolar disor-der. "Make Depakote Your Foundation of Treatment," *at* http://www.depa-kote.com/br/dep/001.htm (September 11, 2001).

**13.** Paxil is indicated for the treatment of major depressive disorder, obsessive compulsive disorder, social anxiety disorder, and generalized anxiety disorder. It is indicated for the treatment of panic disorder with or without agoraphobia. The most commonly observed adverse events associated with its use for treatment of panic disorder are asthenia (weakness, lack of energy or strength), sweating, decreased appetite, libido decreased, and tremor.

Xanax, continued Klonopin[14] and Paxil, and decreased Depakote.[15]

By July 13, 1998, plaintiff had reduced his alcohol consumption. Dr. Sharp recorded side effects from medication: decreased memory, daytime sleeping, nighttime insomnia; forgetfulness. The doctor concluded that Klonopin was producing improvement in the panic disorder, but possibly causing memory problems. He discontinued use of Depakote and instructed plaintiff to return within two weeks.

On the September 9, 1998, examination Dr. Sharp diagnosed panic disorder. Plaintiff had had two panic attacks since the last visit. Other symptoms included autonomic instability, disrupted sleep patterns, and restless legs. The doctor observed deteriorated grooming habits, a slightly anxious affect, and increased motor activity. While beer consumption was down to three beers a day, the doctor advised further decrease in consumption.

Dr. Sharp completed a "Medical Assessment of Ability To Do Work Related Activities (Mental)" on February 8, 1999. Under the category "Making Occupational Adjustments" the doctor opined plaintiff has no useful ability to function in the areas of dealing with the public, dealing with work stresses, and functioning independently. He opined that plaintiff's ability to function in the area of maintaining attention/concentration to be seriously limited, but not precluded. In describing claimant's limitations the doctor said the following:

Pt. limited by poorly controlled panic attacks and dependent personality traits. During an attack he is non-functional. His dependence renders him unable to make decisions alone.

Because chronic anxiety impairs plaintiff's concentration the doctor rated his ability to understand, remember and carry out complex job instructions as poor/none.[16] His ability to understand, remember and carry out detailed but not complex job instructions is "Fair." He has "Good" ability to understand, remember and carry out simple job instructions.

In the doctor's opinion the plaintiff does not rate well in his ability to adjust personally and socially. He rated his ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability as "Fair" because plaintiff's panic attacks are unpredictable. He had missed appointments and the doctor considered him unreliable.

The following new evidence was submitted to the Appeals Council:

1) February 8, 1999, progress notes of Dr. Sharp: panic attacks twice a week—afraid to drive—insomnia, trouble concentrating, and night sweats—periodic panic attacks, one of which had occurred while plaintiff was working on his car and resulted in an accident—part-time work ended week before.

2) April 15, 1999, progress notes of Dr. Sharp: symptoms unimproved—quiet—avoidance eye contact—restless—cooperative;

---

**14.** Klonopin is indicated for the treatment of panic disorder, with or without agoraphobia. PDR.

**15.** He was uncertain if the Depakote worked.

**16.** The meaning of the applicable terms in the assessment follows:

**Unlimited or Very Good**—Ability to function in this level is more than satisfactory. **Good**—Ability to function in this area is limited but satisfactory. **Fair**—Ability to function in this area is seriously limited, but not precluded. **Poor or None**—No useful ability to function in this area.

3) June 14, 1999, progress notes of Dr. Sharp: plaintiff unable to afford medication—thus noncompliant with prescribed medication—no improvement in panic attacks—wife dissatisfied—mental status quiet, cooperative, anxious, and blunted;

4) August 24, 1999, progress notes of Dr. Sharp: depression over last three weeks—panic;

5) March 10, 2000, progress notes of Dr. Sharp: panic disorder better on Zoloft—two panic attacks during the last week;

6) June 5, 2000, progress notes of Dr. Sharp: panic disorder worse—depression set in—plaintiff withdrawn and sleeping excessively;

7) August 25, 2000, appointment with Dr. Sharp: plaintiff no show—due to an increase in his heart rate;

8) August 28, 2000, progress notes of Dr. Sharp: depression and panic disorder better—Dr. Katta claimant's cardiologist.[17]

At the hearing vocational expert Dr. John Bryson testified plaintiff has no transferable skills. Upon reviewing the medical assessment completed by treating psychiatrist Dr. Hugh Sharp, referred to earlier, Dr. Bryson opined that if the assessment were accurate plaintiff would be unable to do his past work. Specific questioning concerning this document follows:

Q. Does this appear to you to be a medical assessment of ability to work—

A. Yes, sir.

Q. —completed by Dr. Sharp?

A. Yes, sir.

Q. If that—if the—if that were determined to be a—an accurate evaluation of his abilities, would he be able to do the past work he's done?

A. No, primarily because of poor or none, ability to function independently or to deal with any work stresses.

Q. How about any other work as you understand that term to be defined in the national economy?

A. No, sir.

Q. And what would your reasons for that be?

A. Same reasons.

The ALJ asked no hypothetical[18] questions.

---

**17.** Her records, too, were added to the appeal record.

**18.** The court notes the following material taken from *Wilson v. Barnhart,* 284 F.3d 1219,-1227 (11th Cir.2002):

If the claimant is unable to do past relevant work, the examiner proceeds to the fifth and final step of the evaluation process to determine whether in light of "residual functional capacity," age, education, and work experience the claimant can perform other work. *See Crayton,* 120 F.3d at 1219. (In the instant case the ALJ only asked the ALJ to qualify the jobs plaintiff had held and whether his skills were transferable skills. He did not ask him if plaintiff could perform his past relevant work.) The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture. *See Allen v. Sullivan,* 880 F.2d 1200, 1201 (11th Cir. 1989). If nonexertional impairments exist, the ALJ may use Medical–Vocational Guidelines as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that the claimant can perform. *See Wolfe v. Chater,* 86 F.3d 1072, 1077–78 (11th Cir.1996). In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments. *See Jones v. Apfel,* 190 F.3d 1224, 1229 (11th Cir.1999),*cert denied,* 529 U.S.

■ In finding that plaintiff is able to perform his past relevant work as a janitor, landscaper, and cook the ALJ ignored the assessment of Dr. Sharp, primarily for two reasons: Dr. Sharp's treatment was limited to only four visits;[19] and the lack of recent treatment (five month lapse between the date of the opinion and the last date Dr. Sharp saw Lacy) is inconsistent with the limitations. The ALJ found plaintiff able to perform a full range of medium work with no more than moderate limitations in the ability to meet the mental demands of work.

■ "The function of a reviewing court is limited to determining whether the Secretary's findings are supported by substantial evidence considering the evidence as a whole." *Mims v. Califano,* 581 F.2d 1211, 1213 (5th Cir.1978). "Substantial evidence is more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 852 (1971). The court is still responsible for scrutinizing " 'the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding.' " *Boyd v. Heckler,* 704 F.2d 1207, 1209 (11th Cir.1983) (quoting *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982)). The Eleventh Circuit has gone on to state the following:

> Our limited review does not, however, mean automatic affirmance, for although we defer to both the Secretary's fact-finding and her policy judgments, we must still make certain that she has exercised reasoned decision making. To this end, we evaluate the Secretary's findings in light of the entire record, not only that evidence which supports her position.

*Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984).

■ The court must further consider whether the decision of the Commissioner contains a material error of law. In *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987), the court held:

> Despite this limited review, we scrutinize the record in its entirety to determine the reasonableness of the secretary's factual findings. *Bridges,* 815 F.2d at 624; *Arnold v. Heckler,* 732 F.2d

1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000).

**19.** The supplemental record on appeal contains the doctor's continued progress notes. The doctor's earlier notation indicates finances played a limiting role in receipt of treatment. In discussing this issue our circuit has had the following to say:

> We agree with every circuit that has considered the issue that poverty excuses noncompliance. *See, e.g., Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir.1987) ("To a poor person, a medicine that he cannot afford to buy does not exist); *Lovejoy v. Heckler,* 790 F.2d 1114, 1117 (4th Cir.1986) (failure to follow prescribed treatment does not preclude reaching the conclusion that a claimant is disabled when the failure is justified by lack of funds); *Dover v. Bowen,* 784 F.2d

335, 337 (8th Cir.1986) ("the ALJ must consider a claimant's allegation that he has not sought treatment or used medications because of lack of finances"); *Teter v. Heckler,* 775 F.2d 1104, 1107 (10th Cir.1985) (inability to afford surgery does not constitute an unjustified refusal and does not preclude recovery of disability benefits). Thus while a remedial or controllable medical condition is generally not disabling, when a "claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." *Taylor v. Bowen,* 782 F.2d 1294, 1298 (5th Cir.1986) (footnote omitted).

*Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir.1988).

881, 883 (11th Cir.1984). No similar presumption of validity attaches to the Secretary's legal conclusions, including determination of the proper standards to be applied in evaluating claims. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir.1982).

 Having evaluated the evidence, the court holds that the evidence does not support the decision denying disability benefits. Improper legal standards were applied. The ALJ failed to consider all the disabling aspects of plaintiff's panic disorder. The ALJ failed to accept the opinion of treating physician [20] Sharp that plaintiff suffers from debilitating panic attacks—an opinion bolstered by other medical records.[21, 22] The ALJ failed to consider the effects of the side effects of plaintiff's medication.[23, 24]

For the above-stated reasons the court holds that the opinion of the Commissioner is REVERSED. An order consistent with this opinion is being entered contemporaneously herewith.

### FINAL ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of Social Security be and it hereby is REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be granted the benefits claimed.

It is FURTHER ORDERED that the Commissioner withhold from payments which he may determine are due plaintiff

---

**20.** The law is clear that the ALJ must give substantial weight "to the opinion, diagnosis, and medical evidence of the claimant's treating physician." *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir.1982). *See also Walker v. Bowen*, 826 F.2d 996(11th Cir.1987); *Smith v. Schweiker*, 646 F.2d 1075 (5th Cir.1981). The Eleventh Circuit has gone further to hold that where the Secretary ignores or fails to properly refute a treating physician's report, the findings in that report are to be accepted as true as a matter of law. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986). The Secretary must give "explicit and adequate reasons for rejecting the opinion of the treating physician." *Elam v. Railroad Retirement Board*, 921 F.2d 1210, 1215 (11th Cir.1991).

**21.** Opinions of Doctors Katta, Geist, Turpin, McDonald, and Huntsville ER records.

**22.** Plaintiff's documented symptoms of panic disorder include nausea, chest pain, accelerated heart rate, sweating, shortness of breath, shaking hands, rapid speech, excitement, restless legs, disruptive sleep patterns, and tremulous motor movements.

**23.** The side effects of plaintiff's medication have been set forth in detail in this opinion.

Documented side effects include drowsiness, light-headedness, dry mouth, nervousness, dizziness, weakness, queasy stomach, decreased memory, forgetfulness, day-time sleeping, and night-time insomnia. Rather than taking the time to educate himself on the debilitating side effects of these medications he summarily dismissed claimant's complaints. Furthermore, the ALJ did not pose any questions to the vocational expert concerning the effect of medication on Mr. Lacy's ability to work, the preferred method of demonstrating that the claimant can perform specific jobs. *Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir.1981). "When there have been nonexertional factors (such as depression and medication side effects) the preferred method of demonstrating that the claimant can perform specific jobs is through the testimony of a vocational expert. *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir.1986) (citing *Cowart*).

**24.** "When there have been nonexertional factors (such as depression and medication side effects) alleged, the preferred method of demonstrating that the claimant can perform specific jobs is through the testimony of a vocational expert. *Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir.1981)." *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir.1986).

under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of section 206 of the Social Security Act, as amended 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fees to be allowed plaintiff's counsel for services rendered in representing the plaintiff in this cause.

It is FURTHER ORDERED that pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby GRANTED an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*