Irwin BROWN, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. 04–61427–CIV.

United States District Court, S.D. Florida.

Jan. 23, 2006.

Irwin M. Brown, North Miami Beach, FL, pro se.

---

## ORDER

TORRES, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff Irwin Brown ("Claimant") and by Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner") pursuant to the Order Referring Case to Magistrate Judge, entered by the Honorable William P. Dimitrouleas, United States District Judge [D.E. 13] that followed the parties' Joint Stipulation to Consent to Magistrate Judge Jurisdiction [D.E. 12].

This is an action seeking review of the final decision of the Commissioner denying Claimant's application for disability benefits under Title II for the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.* Overall, the cross-motions present the following issue: whether there exists substantial evidence to support the determination by the Administrative Law Judge ("ALJ") that Claimant is not disabled under the Social Security Act and retains the residual functional capacity to return to his past relevant work. In doing so, Claimant only challenges the ALJ's characterization of his past relevant work and Claimant's ability to return to that work. The Under the limited standard of review that governs this case, this Court concludes that substantial evidence does support the ALJ's determination. Plaintiff's Motion for Summary Judgment [D.E. 11] shall be denied, Defendant's Motion for Summary Judgment [D.E. 14] shall be granted, and the Commissioner's decision shall be affirmed.

### II. PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits on May 24, 2000 un-

der Title II of the Act. (Tr. 81–83). Claimant allegedly became disabled as of February 1, 1999 due to, as stated in his Disability Report, left knee and lower back problems, high blood pressure, and an enlarged thyroid. (Tr. 17, 97). The Social Security Administration ("SSA" or "Administration") denied the applications initially (Tr. 63–64, 68–69) and upon reconsideration. (Tr. 65–67, 74–75).

Thereafter, Claimant requested and was granted a hearing before an administrative law judge. (Tr. 24, 28). On May 1, 2002, Claimant appeared before Administrative Law Judge James E. McAfee, Jr. in Fort Lauderdale, Florida, and testified as to his impairments. (Tr. 17, 33–62). On May 22, 2002, the ALJ found that Claimant was not under a "disability," as defined in the Act and issued a decision denying Claimant's application for benefits. (Tr.17–23). Thereafter, on May 28, 2002, Claimant requested review by the Appeals Council of the unfavorable ALJ decision. (Tr. 9–13, 309). On August 23, 2004, the Appeals Council denied Claimant's request for review, thereby allowing the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4–8).

On October 29, 2004, Claimant filed this Complaint [D.E. 1] seeking reversal of the Commissioner's final decision. On February 18, 2005, the Commissioner filed an Answer [D.E. 8] to Claimant's complaint. On June 29, 2005, Claimant filed his Motion for Summary Judgment [D.E. 11], and on July 28, 2005, the Commissioner filed Defendant's Motion for Summary Judgment and responded to Claimant's motion [D.E. 24]. Claimant did not file a response/reply brief.

On September 14, 2005, the parties appeared before the Court for argument on their pending motions for summary judgment. At the conclusion of the hearing, the Court posed a series of questions to the parties and requested supplemental briefing [D.E.17 and 18]. On September 26, 2005, the Commissioner filed the requested reply brief [D.E. 19]. Although given the opportunity to respond to Defendant's reply, Claimant chose not to, and thus this case is now ripe for disposition.

## III. FACTS

### A. General Background

Claimant was born on November 25, 1943 and was 55 years old at the time of the onset of his claimed disability. (Tr. 17, 36, 81). Claimant is not currently employed but worked for the City of Pembroke Pines as an air conditioner mechanic from 1985 until 1995 and then as a desk clerk until he retired in February of 1999 (Tr. 17, 37–42, 97–98, 108). While working at this latter position, as a desk clerk, Claimant earned approximately $30,000 per year. (Tr. 86).

Claimant alleges that he has been unable to work since February 1, 1999 due to various ailments. (Tr. 17, 81, 97). In applying for benefits, he initially alleged that he became disabled due to due to knee and back problems and the resulting pain, high blood pressure, and an enlarged thyroid. Upon his appearance before the ALJ, Claimant also discussed the effects of depression and carpal tunnel syndrome. (Tr. 17, 44–50,61, 97).

### B. Medical Evidence/Treating Physicians

Claimant has been treated and/or evaluated by various doctors and, thus, for simplification of the medical treatments and diagnoses received by Claimant, each physician's findings will be set forth below.

### 1. Dr. Thomas Woolhiser, Chiropractor

From 1995 through 1998, Claimant received chiropractic treatment from Dr. Thomas Woolhiser, D.C. for his complaints

of lower back pain stemming from a 1993 work injury. (Tr. 125–216). Throughout this time, Claimant was diagnosed with cervical strain, lumbar radiculopathy, dorsolumbar myofascitis, post-operative left knee derangement, and/or multiple subluxation complexes. (Tr. 126, 142, 157, 177, 184, 192). Dr. Woolhiser recommended conservative treatment, instructed Claimant on exercises and biomechanics, and, at times, recommended that he consult an orthopedists for his left knee pain as well as have a magnetic resonance imaging scan ("MRI") performed. (Tr. 126, 143, 157, 178, 184 192). During Claimant's last documented visit in October 1998, Dr. Woolhiser stated that the conservative techniques employed to promote lumbar motion were effective and that Claimant had received "great" pain relief from these treatments. (Tr. 126). He then reiterated that Claimant had reached maximum medical improvement and was to be seen on an as needed basis when flare-ups occurred. *Id.*

### 2. Dr. Richard Kleiman, Orthopedist

On May 7, 1998, Plaintiff presented to Richard S. Kleiman, M.D., with complaints of wrist pain. (Tr. 219). On examination, Claimant moved his fingers "well," did not experience tenderness, numbness, or tingling; and there was no atrophy in his hand. *Id.* Dr. Kleiman reported that neurovascular status was within "normal limits, and that cross finger testing was negative." *Id.* Further, Claimant's x-rays were "normal." *Id.* In light of these results, Dr. Kleiman's impression was that of "mild" left wrist pain secondary to repetitive activity; however, he noted that Claimant could continue to work "normally." *Id.* Thereafter, Claimant was instructed to alternate hands while using the calculator,

use a rubber sponge ball for exercise, employ heat intermittently, and use a wrist rest or a rolled towel while working on the calculator in order to alleviate his symptoms. *Id.*

### 3. Dr. Jeffrey Worth, Orthopedist

On September 10, 1998, Claimant underwent an MRI at the direction of Dr. Jeffrey Worth, M.D. (Tr. 250). The scan showed degenerative disc disease in the lumbar spine, "mild" central canal stenosis at L1–L4 secondary to disc bulging and some foraminal narrowing at these levels. (Tr. 251). Furthermore, it was noted that at L4–5 there was "marked" central stenosis and "moderate" narrowing due to a disc herniation, and at L5–S1 there was a "small" central disc herniation with "mild" compression of the thecal sac. *Id.* Thereafter, Dr. Worth prescribed epidural steroid injections. (Tr. 247).

### 4. Dr. Brian A. Zalis, General Practioner

On January 12, 1999, Claimant saw his primary care physician, Dr. Brian A. Zalis, M.D. for a consultative examination regarding complaints of back pain. (Tr. 230). At that time, Dr. Zalis recommended the continued use of Naprosyn, an anti-inflammatory, and after noting that Claimant's thyroid was enlarged, he prescribed an ultrasound. *Id.* Dr. Zalis then scheduled a follow-up appointment for Claimant on February 5, 1999, but Claimant failed to attend. *Id.*

Claimant did return, however, to Dr. Zalis's office on March 31, 1999, after undergoing an ultrasound of his thyroid on March 3, 1999. (Tr. 229, 242). The results of the ultrasound of suggested the presence of a micronodular goiter, for which Dr. Zalis prescribed Synthroid.[1] *Id.* In

---

1. A goiter is an enlargement of the thyroid gland causing swelling in the front part of the neck. *See Dorland's Illustrated Medical Dictionary* 789 (30th ed.2003). Furthermore, Synthroid is a medication used as replace-

April 1999, Dr. Zalis instructed Claimant to stop taking the Synthroid for the next six weeks in anticipation of another ultrasound scheduled for June. (Tr. 229). The June 1999 scan showed that Claimant's thyroid had no focal nodules and was "mildly" enlarged. (Tr. 241).

Additionally, Claimant saw Dr. Zalis on May 24, 2000, with symptoms of uncontrollable shaking and an elevated heart rate. (Tr. 226). In response, Dr. Zalis reduced Claimant's Synthroid dosage, after which a subsequent exam revealed a regular heart rate and rhythm. *Id.*

### 5. *Dr. Joel Coplowitz, Internist*

On July 3, 2000, Plaintiff saw Joel A. Coplowitz, M.D., for a consultative examination. (Tr. 284–87). At the time, Claimant complained of "intermittent" low back pain and problems with his left knee. (Tr. 284). He reported to Dr. Coplowitz that he could walk up to one-half of one mile, could not climb stairs, could lift up to 20 pounds, could stand for 15 to 30 minutes at a time, and could sit for 15 minutes at a time. *Id.* Claimant further stated he suffered from hypertension, elevated cholesterol, and Graves' disease and the his medication included two anti-hypertensive medications, a beta blocker, an anti-lipemic agent, and Synthroid. *Id.*

Upon examination, Claimant's blood pressure read 180/98. (Tr. 285). Dr. Coplowitz noted that there was no evidence of joint swelling, tenderness, or deformity, and that Claimant had a "full" range of motion in all joints. *Id.* He also reported that there was "some kind" of crepitus on passive range of motion of the left knee as well as some "mild" swelling, which was "probably secondary to a small joint effusion." *Id.* Additionally, he noted that there was no paraspinous spasm, and "simply no limitation of the range of motion of the LS spine." *Id.*

The neurologic portion of the examination revealed Claimant as oriented and with no evidence of difficulty with memory or thought disorder. *Id.* Dr. Coplowitz further reported that Claimant's cranial nerves were intact, his coordination, gait and station, sensation, motor testing, and reflexes were normal. *Id.* An MRI scan of Claimant's lumber spine revealed "mild" narrowing of the L2–3, L4–5, and L5–S 1 disc spaces, and levoscoliosis of the lumbar spine, while a scan of the left knee revealed "findings compatible with degenerative arthritis." (Tr. 287). Dr. Coplowitz's impression was that of low back pain secondary to a herniated disc, derangement of the left knee, hypertension, elevated cholesterol, and history of Graves' disease. (Tr. 285–86).

### 6. *Dr. Sayonara Baez, Psychiatrist*

On August 9, 2000, Claimant presented to Sayonara Baez, M.D., for a psychiatric assessment. (Tr. 297). He reported emotional stressors being harassment from his employer four years earlier and marital difficulties. *Id.* He then discussed with Dr. Baez his two year history of individual therapy, but denied any history of psychiatric hospitalizations or suicide attempts. (Tr. 298). He described a typical day: waking at 6:30 a.m., spending some time watching television, attempting to walk a bit, and then spending "most of the time" on the computer. *Id.* Dr. Baez observed that Claimant was "carefully" dressed and had "good" hygiene, presented no evidence of psychomotor abnormalities, and that his associations were "tight and coherent." *Id.* Although she characterized his mood as "subdued," she also stated that his affect was appropriate and that his insight and judgment were both "good." *Id.* Furthermore, she reported that he was oriented and his memory was intact. *Id.*

ment therapy for hyperthyroidism. *Id.* at 1025, 1839.

It was Dr. Baez's impression that Claimant had an adjustment disorder with depressed mood, and she gave him a global assessment of functioning (GAF) at a level 70. (Tr. 299).[2] Moreover, there was no evidence of any "significant" degree of psychopathology affecting his daily functioning. *Id.* Dr. Baez opined that Claimant was able to manage his own funds, relate to supervisors and coworkers, and follow simple commands. *Id.* She also believed that Claimant would have only "minor" difficulties with attention and concentration required to follow complex commands. *Id.*

### 7. Drs. Lola C. Jorge and Mercedes M. de Cuba, State Agency Consultants

On July 21, 2000, state agency medical consultant Lola C. Jorge, M.D. evaluated Claimant at the initial level. (Tr. 63, 289–296). In doing so, Dr. Jorge concluded that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for about six hours in an eight-hour day, and sit for about six hours in an eight-hour day. (Tr. 290). Shortly thereafter, on August 23, 2000, Claimant presented to psychologist Mercedes M. de Cubas, Ph.D. for further review. (Tr. 300–308). While interviewing Claimant, the consultant specifically noted that Claimant was able to understand and follow instructions, could sustain goal directed activity, and that any limitations in his functioning appeared mild. (Tr. 301). She also reported that Claimant was able to interact appropriately with others and "should have

no problems with supervisors or co-workers." *Id.* Furthermore, in completing the Psychiatric Review Technique Form, Dr. de Cubas opined that Claimant had no restrictions of activities of daily living, no difficulties maintaining social functioning, "seldom" had deficiencies of concentration, persistence, or pace, and "never" had episodes of deterioration or decompensation. (Tr. 307).

### C. Testimony Before the ALJ

Claimant appeared and testified at an administrative hearing held on May 1, 2002. (Tr. 33–62). He stated that he was born on November 25, 1943, was married for 36 years and lived in a house with his wife, his daughter, and his grandson. (Tr. 36). Claimant stated that he was a high school graduate, was employed as an air conditioner mechanic for the City of Pembroke Pines, and had last worked as a desk clerk for the City. (Tr. 37–41). Claimant retired in 1999, after which he received a monthly retirement check for $1,115. (Tr. 37, 41).

He testified that he had worked as an air conditioner mechanic for Pembroke Pines for approximately ten years, but stopped in 1996 after having surgery on his left knee (Tr. 39–40). Claimant further testified that, at that time, he was placed in an office where he and approximately three others answered the telephone for the water department. (Tr. 40). Claimant answered the telephone three to five times a day, and spent the rest of the day reading the newspaper, reading books, or playing computer games. (Tr. 41).

---

**2.** Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. A GAF of 61 through 70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social or occupational functioning, but generally functioning pretty well, and having

some meaningful interpersonal relationships. A GAF of 71 through 80 indicates that, if symptoms are present, they are transient and expected reactions to psychosocial stressors, and cause no more than slight impairment in social or occupational functioning. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders Text Revision,* 32–34 (4th ed.1994).

He performed this job from 1996 to 1999 and was then transferred to a different position where he calculated water bills. (Tr. 41–42, 54). He stated that he held this calculating position for approximately three months and that this work caused him to develop carpal tunnel syndrome. (Tr. 42). He also testified that he also often missed work due to back or leg problems. *Id.* According to the Claimant, he experienced "too much pain, too much pressure" from this position. *Id.* Significantly, as a result, if he could not complete his calculations his work would be finished by another person in the office. (Tr. 42, 54). It was at that time, given his pain and depression, that Claimant elected to retire, although he claimed that he "could have stayed at the phones [position]." (Tr. 60–61).

With respect to his ailments, Plaintiff testified that he suffered from severe left knee pain. (Tr. 44–45). He stated that in 1993 he tripped and hit his knees on the concrete floor. *Id.* The injury got progressively worse and culminated in surgery two years later. *Id.* He also suffered from lower back pain since 1993, due to two or three bulging discs and one herniated disc, with the pain manifesting itself throughout his body, especially his legs. (Tr. 45–47). He also developed carpal tunnel syndrome in both wrists from using a calculator, but that the pain had improved after he stopped working. (Tr. 48). He also said he had recently been diagnosed with Graves' disease that was causing his eyes to bulge and occasionally double vision. *Id.* Additionally, he mentioned feeling depressed and having anxiety attacks. (Tr. 61).

Claimant contended that he could no longer walk one-half of a mile as he had told Dr. Coplowitz in July 2000. (Tr. 49, 284). His medications at the time included an anti-inflammatory, an anti-hypertensive, a beta-blocker, a cholesterol lowering agent, a baby aspirin, and a vitamin. (Tr. 50, 55–56). He also had an analgesic medication, which was some form of Tylenol, and that, although it was helpful, he only took it sparingly. *Id.*

When asked about his physical abilities, Claimant responded that on a typical day, after getting up, he would feed the pets, clean the house and do other chores, like making the bed and doing laundry. He also did some prescribed exercise and watched television. (Tr. 51–52). He would also play computer games, read, and/or visit his neighbors. (Tr. 51). He also said that he did "minor" yardwork, but often with his neighbors' assistance. (Tr. 58). He said he could lift approximately 15 pounds, and he had no trouble driving as long as the car was an automatic. (Tr. 57, 59).

Claimant also said that he attended air shows with his wife, sitting and standing while there. (Tr. 51). He also went to the store, and occasionally lunched with his daughter, his friends, or with his grandson at his school. (Tr. 51, 59). Claimant also enjoyed watching his daughter bowl, attending his grandson's baseball games, and building toy cars with the grandson. (Tr. 58)

### D. The ALJ's Decision

The ALJ rendered his decision on May 22, 2002. (Tr. 17–23). The ALJ found that, although Claimant suffered from chronic back and left knee pain, hypertension and Graves' disease, these impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. 17–20, 22). The ALJ then determined that Claimant retained the residual functional capacity to perform sedentary work.[3] (Tr. 17–20, 22). The ALJ

---

**3.** "Sedentary work" involves lifting no more than ten (10) pounds at a time and occasion-

found that Claimant's allegations of total disability were not credible, that Claimant's desk clerk position constituted past relevant work, and that his impairments would not preclude him from performing that past relevant work as he performed it. (Tr. 20–22). Given that Claimant retained the residual functional capacity to return to his past relevant work, the ALJ held that Claimant was not disabled as defined under the Social Security Act and was not, therefore, entitled to disability benefits. (Tr. 22).

## IV. STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, a court's role is a limited one. *Bloodsworth v. Heckler,* 703 F.2d 1233 (11th Cir.1983). The Commissioner's findings of fact must be affirmed if they are supported by "substantial evidence." *Id.; Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "Substantial evidence" is more than a scintilla of evidence but less than a preponderance, and is such relevant evidence that a reasonable person might accept as adequate to support the challenged conclusion. *Id.* at 401, 91 S.Ct. at 1427; *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir.1995); *Walden v. Schweiker,* 672 F.2d 835, 839 (11th Cir.1982). In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 (11th Cir.1982).

ally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *20 C.F.R. § 404.1567(a).*

The scope of review is also limited to an examination of the record only. *E.g., Reynolds v. Secretary of Health & Human Servs.,* 707 F.2d 927 (6th Cir. 1983). If the ALJ's decision is supported by substantial evidence in that record, the reviewing court must affirm the decision. *Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir.1996). The court may not "decide facts anew, reweigh evidence, or substitute its judgment for that of the [Commissioner]." *Bloodsworth,* 703 F.2d at 1239.

## V. ANALYSIS

### A. The Sequential Evaluation and Its Application by the ALJ

Initially, a claimant has the burden of establishing that he or she is disabled under the Social Security Act. *Walden,* 672 F.2d at 838; *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir.1991). A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses;

Social Security Ruling 83–10 elaborates on § 404.1567(a) by providing that " '[o]ccasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour work day...." Social Security Ruling 83–10, 1983 WL 31251, at *5 (S.S.A.1983).

and 4) the claimant's age, education, and work history. *Walden,* 672 F.2d at 839.

*Step One.* To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520. This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If so, a finding of "no disability" is made. If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

As a threshold matter, the ALJ here determined that Claimant met the disability insured status requirements of the Social Security Act on February 1, 1999, the alleged onset date, and was insured for disability benefits through December 31, 2004. (Tr. 17, 22). The ALJ then applied the facts, as he found them, to the sequential evaluation framework. At Step One, he found that Claimant has not engaged in substantial gainful activity since her alleged onset date. *Id.*

*Step Two.* At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ will proceed to the next phase of the analysis. *Id.* The ALJ in this case found that Claimant's chronic back and left knee pain, hypertension and Graves' disease constituted severe impairments. (Tr. 17,

21). Moreover, the ALJ found that Claimant's alleged depression was not a severe impairment, and that there was no evidence to support Claimant's allegation that the had been diagnosed with carpal tunnel syndrome. (Tr. 20–21).[4]

*Step Three.* The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations. 20 C.F.R. § 404.1520(d). Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled regardless of their vocational background. *Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987). If the ALJ concludes that the impairments meet or equal one of those listed and meet the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(iii) & (d). If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 18–20, 22). Accordingly, to find Claimant disabled he needed to proceed to the next step in the analysis.

*Step Four.* This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). This

4. Claimant does not dispute these findings. *See* D.E. 11 at p. 4–5.

determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony; and the observations of others. *Id.* The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work. If so, the ALJ will conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity to perform his past relevant work. (Tr. 18–21, 22). In making that assessment, the ALJ considered Claimant's subjective complaints, but he found that those complaints were not credible to the extent alleged. (Tr. 19–21, 22). The ALJ determined that Claimant's allegations of total disability were not consistent with and were disproportionate to the evidence in the record. (Tr. 20). The ALJ also carefully considered all of the medical opinions in the record regarding the severity of Claimant's impairments, including the residual functional capacity assessments completed by state agency physicians. (Tr. 18–21). In doing so, the ALJ expressly noted that "[t]he results of the consultative examination are on par with the ability to perform light work, which was the conclusion reached by the state agency medical examiner." (Tr. 20).

Based upon his review of the entire record and, after specifically giving Claimant "the benefit of the doubt," the ALJ found that Claimant is capable of performing sedentary work and that he retained the residual function capacity to perform work-related activities, except for work involving lifting more than 10 pounds occasionally and lesser weights frequently and standing or walking for more than two hours during an eight hour workday. (Tr. 20–22).

The ALJ then examined Claimant's last employed position as a desk clerk and compared the demands of this position with Claimant's residual functional capacity. (Tr. 21–22). In doing so, the ALJ ascertained that Claimant's desk clerk job qualified as past relevant work and sedentary work. The ALJ found no record evidence to show that the position was the equivalent of a sheltered workshop *Id.* As such, the ALJ found that Claimant's past relevant work did not require the performance of work-related activities precluded by his residual functional capacity or impairments. (Tr. 20–22). Therefore, the ALJ determined that Claimant could return to his past relevant work as a desk clerk. (Tr. 22). Accordingly, the ALJ concluded that Claimant was not under a "disability" as defined in the Social Security Act. *Id.* The ALJ, consequently, did not proceed to Step Five of the analysis.[5]

## B. The ALJ's Decision is Supported by Substantial Evidence

Claimant disputes the findings and conclusions of the ALJ. Claimant asserts that the ALJ incorrectly found that he could return to his past relevant work as a desk clerk. This conclusion is based on two limited arguments. Claimant first contends that his position as a desk clerk does

---

5. Had the ALJ determined that Claimant could not have continued to perform his past relevant work, at step five the burden would have shifted to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that Claimant can perform. *Walker v. Bowen,* 826 F.2d 996, 1002 (11th Cir.1987); *Smith v. Schweiker,* 646 F.2d 1075, 1077 (5th Cir. 1981). If the Commissioner proffers possible alternative employment, the burden returns to a claimant to prove an inability to perform those jobs. *Id.* The ALJ must then resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(f).

not constitute past relevant work. He then alternatively argues that, if his job does qualify as past relevant work, then the requirements of the position exceed his determined residual functional capacity.

### 1. Past Relevant Work Assessment

Claimant argues that the ALJ erred in including his desk clerk position as past relevant work. In making this argument, Claimant faults the ALJ for failing to find that his desk job was actually sheltered employment. He contends that the desk clerk position provided to him by the City of Pembroke Pines was essentially fictional and does not constitute substantial, gainful activity under the Act. The issue, therefore, is what constitutes past relevant work under the Act.

In order to constitute past relevant work, the position in question must have been done within a fifteen year period, lasted long enough for the claimant to learn to do it, and be performed at a substantial gainful activity level. *See* 20 C.F.R. § 404.1565(a)(2005); Social Security Ruling 82–61 ("S.S.R.82–61"), Titles II and XVI: Past Relevant Work —The Particular Job or Occupation as Generally Performed (reprinted at 1982 WL 31387). Moreover, an individual's work will be presumed to be substantial gainful activity if his monthly earnings, for the year 1990 through 1999, averaged more than $500. *See* 20 C.F.R. § 404.1574(b)(2)(i)(2005).

■ Although Claimant argues that he only had past relevant work as an air conditioner mechanic, the ALJ applying these standards correctly found otherwise. According to Claimant he was transferred to his desk job in 1996 (Tr. 41), which clearly falls within the 15–year period preceding the December 31, 2004 date in which Claimant's disability insurance was last met. Furthermore, he performed the position, that primarily consisted of answering telephones, for several years until 1999, and he earned over $30,000 each

year in 1996, 1997, and 1998. (Tr. 41, 86). Accordingly, he had ample time to learn the job requirements, as he even admitted he was able to perform the work (Tr. 61), and his average monthly earnings for each of those years were at least $2,500—well above the $500 presumptive minimum. Thus, the ALJ properly determined that Claimant's position as a desk clerk constituted past relevant work as defined in the regulations.

Notwithstanding, Claimant still maintains that his desk clerk position should not be considered past relevant work because it was a sheltered job that was essentially created specially for him after his knee injury. (Tr. 38; 9/14/05 Hearing Tr. 4). However, when presented with this argument, the ALJ explicitly found that "[t]here is no evidence in the record that suggests that the claimant's desk job was the equivalent of a sheltered desk job." (Tr. 21–22). The Claimant now bears the burden of demonstrating that certain work experience does not qualify as past relevant work. *See Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir.1991). Upon review of the record, the Court must conclude that Claimant has not met his burden.

Under the regulations, a "sheltered workshop" describes facilities that operate at a loss or receive government aid. See 20 C.F.R. § 404.1574(a)(3); (9/14/05 Tr. 15 and 20). The fact that a sheltered workshop operates at a loss or receives such contributions or aid does not per se establish that an employee is not actually earning all that he is being paid. *See* 20 C.F.R. § 404.1574(a)(3). Moreover, it is well settled that working in a sheltered environment can still constitute substantial gainful activity. *See* 20 C.F.R. § 404.1574(a)(2), (a)(3) and (b)(2); *see also, e.g. Hamilton v. Sullivan*, No. 1:90 CV 2307, 1991 WL 346308 at *3 (N.D.Ohio

Oct.28, 1991); *Fogarty v. Secretary of Health and Human Servs.*, 690 F.Supp. 166, 168–169 (W.D.N.Y.1988); *DeRienzis v. Heckler*, 748 F.2d 352, 354 (2nd Cir. 1984). This level is still acquired if the employee's non-subsidized earnings still meet the presumptive earning level. *Id.*

Moreover, sheltered employment is work "provided for handicapped individuals in a protected environment under an institutional program." *See Program Operations Manual System* ("POMS") § DI 10505.020.B.2.[6] Sheltered workshops engage in manufacturing, assembly, reconditioning, repair and other operations which may involve direct sales to consumers and retailer, or the fulfillment of industrial contracts. *Id.* (stating that in addition to these sheltered workshops, the most common types of sheltered employment also include hospitals, Veterans' Administrations domiciliaries, long-term care institutions, and homebound employment).

Such work may be performed under special conditions, including receiving of special assistance from other employees, irregular work schedules, additional rest periods, special equipment, lower expectations of productivity, or work allowed based on a family relationship, past association with the employer, or the employer's concern for the individual's welfare. *See* 20 C.F.R. § 404.1573(c). Furthermore, as described in the PMOS, special conditions may be comprised of "job coaching and like services" or other on-the-job assistance. *See* POMS § DI 10505.010.A.4. In these situations, the job coach performs part or all of the individual's job duties, or provides close and continuous supervision. *See id.* These special conditions "are not technically 'subsidies,'" but are considered in evaluating the value of the employee's work to determine whether the work was performed at the substantial gainful activity level. *See id.* Only the wages which are actually earned by the individual are counted. *See id.* An individual may be engaged in substantial gainful activity even if the work is performed under special conditions. *See* 20 C.F.R. §§ 404.1573 and 404.1574.

Here, Claimant contends that his desk job does not constitute substantial gainful activity, and thus past relevant work, because of its sheltered characteristics. (Tr. 38; 9/14/05 Hearing Tr. 4, 7–9, 36). According to Claimant, his desk job cannot be considered past relevant work because it was wasteful, as "no ... sane employer would set up such a job in a regular competitive employment" and such a job does not exist elsewhere in the national economy. *Id.* In response, the Commissioner argues that the record demonstrates otherwise. The Court agrees.

In 1996, the City of Pembroke Pines transferred Claimant, to accommodate his physical ailments, from his former job as an air conditioning mechanic to a desk position. (Tr. 41). Claimant worked at this desk job for approximately three years. *Id.* During the majority of that time, he was primarily responsible for answering phones, and later he calculated water bills for approximately three months. (Tr. 41–42). Claimant testified that he performed these tasks and, when he was unavailable, there were others in the office who performed the tasks and who also covered for him. (Tr. 41–42, 61).

The record thus reflects that Claimant was on task for three years, more than one person had his job, and his responsibilities had to be fulfilled regardless of whether he

---

**6.** The POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits and is located online at *http://policy.ssa.gov.*

Furthermore, "While the POMS does not have the force of law, it can be persuasive." *Stroup v. Barnhart*, 327 F.3d 1258 (11th Cir. 2003) (citations omitted).

was present at the office. Moreover, given that other people performed his duties, it is difficult to see how his position was created solely for him. As such, it is evident that Claimant's desk job was not fictional and superfluous to the point that it could not constitute substantial gainful activity. *See, e.g., Tyra v. Secretary of Health and Human Servs.,* 896 F.2d 1024, 1031 (6th Cir.1990) (ALJ correctly determined that city government worker's transferred position, given to accommodate his physical limitations, was not "makeshift" and constituted substantial gainful activity); *cf., Roberts v. Apfel,* 27 F.Supp.2d 1295, 1296, 1299 (N.D.Ala.1998) (ALJ erred in concluding that a position that allowed claimant, whose health deteriorated, to maintain his same job title and draw his original paycheck, but who could no longer perform its requirements, was substantial gainful activity).

Moreover, as previously discussed, Claimant's earning record establishes that he made in excess of the monthly $500.00 limit to create the rebuttable presumption that he is performing substantial gainful activity. (Tr. 86); *see* 20 C.F.R. § 404.1574(b)(2)(i). Claimant has failed to present evidence showing that his work was not worth that amount or that his earnings from this position should be reduced such that they would fall below the presumptive substantial gainful activity level. *See* 20 C.F.R. §§ 404.1574(a)(2) and (b)(2).

Rather, to rebut this presumption, Claimant conclusorily suggests that his work was performed under special conditions. (Tr. 38–41). However, Claimant admitted that he was able to independently perform the duties required of him. (Tr. 41 and 61). Furthermore, the record is devoid of information demonstrating that he required special assistance or supervision. Additionally, there were several other individuals performing the same work.

(Tr. 41–42). As such, record support for Claimant's contention is sorely lacking.

Additionally, the principal authority Claimant relies upon that was cited above, *Roberts v. Apfel,* does not help Claimant's position. In *Roberts,* the District Court concluded that the only evidence in the record was the claimant's testimony that, after his health deteriorated to the point he could no longer perform the duties of an Assistant Superintendent for the public works department of a municipality, his employer allowed him to maintain that position at the same salary yet without performing any meaningful work as a superintendent. This was a fictional position that the employer provided to the claimant to reward loyal service and as part of his retirement. 27 F.Supp.2d at 1299. Most importantly, the problem in *Roberts* was that the ALJ never made a finding whether the claimant's factual allegations were true and whether his past employment was so truly unproductive that it could not constitute past relevant work under the Act. *Id.* ("[past relevant] work done must be real work for profit").

Here, those circumstances are simply not present. Claimant did not continue earning a paycheck as an air conditioning mechanic after his knee injury in 1993 and did not receive merely charitable treatment from his employer. Instead, after he could not be a mechanic any longer, Claimant was transferred to administrative positions in the same department, at reduced pay, so he could perform office work for the department that his limitations allowed. (Tr. 86–87). The desk clerk position was real work for profit, albeit less profit, but the work was not fictional. When Claimant was not able to go to work, someone else performed those duties and covered for him. When he was there, Claimant testified quite clearly that he was able to do the work. (Tr. 41–42, 54). He

did so much work that he felt he was under "too much pressure"—a factor that contributed to his own voluntary decision to retire. (Tr. 42, 60–61). Therefore, unlike *Roberts v. Apfel,* this position cannot constitute sheltered work under the applicable regulations.

Based on the foregoing, the ALJ's decision qualifying Claimant's desk clerk position as past relevant work is amply supported by substantial evidence. The record reflects that Claimant's desk clerk position constitutes past relevant work since it was timely, learned, and performed at a substantial gainful activity level. Moreover, the ALJ properly determined that the position was not the equivalent of a sheltered workshop. Claimant failed to meet his burden and has not substantiated his claim of error. Accordingly, the ALJ's decision cannot and shall not be disturbed on appeal. ·

### 2. *Performance of Past Relevant Work*

██ Claimant alternatively argues that, if his desk clerk position constitutes past relevant work, then his determined residual functional capacity precludes its performance, and Claimant faults the ALJ for finding otherwise.

The ALJ found that Claimant is capable of performing sedentary work, retaining the residual function capacity to perform work-related activities except for work involving lifting more than 10 pounds occasionally and lesser weights frequently, and standing or walking for more than two hours during an eight hour workday. (Tr. 20–22). Claimant contends that since the Dictionary of Occupational Titles ("DOT") classifies a desk clerk as light work [7], he is unable to return to this position since its requirements exceed his capacity to perform only sedentary work.

In this case, however, the DOT classification is of little moment since the ALJ found that Claimant could perform his past relevant work as a desk clerk *as he performed it.* (Tr. 5, 21, 41, 108). Social Security Ruling 82–61 clearly states that, under section 404.1520(e), a claimant will be found to be "not disabled" when it is determined that he retains the residual functional capacity to perform the actual functional demands and job duties of a particular past relevant job, *or* the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *See* S.S.R. 82–61 at 1982 WL 31387; *see also Moad v. Massanari,* 260 F.3d 887, 891 (8th Cir.2001) (quoting S.S.R. 82–61, "While DOT classifications are sometimes important, we fail to see the relevance in this case. [Claimant] was not disabled if, as

---

7. "Light work" is defined as work that involves *lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.* 20 C.F.R. § 404.1567. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls. Social Security Ruling 83–10, 1983 WL 31251, at *5–6 (S.S.A.1983).

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8–hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work. *Id.*

the ALJ found, she could perform '[t]he actual functional demands and job duties of a particular past relevant job'.") (citing *Jones v. Chater,* 86 F.3d 823, 826 (8th Cir.1996)).

Moreover, Claimant fails to provide any evidence showing that he could not perform his past work. In fact, he admitted at the administrative hearing that he was able to perform the duties required of him and could have stayed at that position. (Tr. 60–61). The ALJ, thus, properly determined, as the record demonstrates, that Plaintiff could return to his past relevant work as a desk clerk as he performed it. Accordingly, the ALJ's finding shall not be disturbed by this Court.

## VI. CONCLUSION

Claimant had a fair hearing and a full administrative consideration in accordance with the applicable statutes and regulations. Substantial evidence supports the ALJ's findings as explained in his May 22, 2002 Notice of Decision. For the foregoing reasons, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment [D.E.11] is hereby **DENIED**.

2. Defendant's Motion for Summary Judgment [D.E. 14] is hereby **GRANTED**.

3. The final decision of the Commissioner is **AFFIRMED**. **FINAL JUDGMENT** is hereby entered in favor of the Commissioner in this matter.

4. The Clerk shall deny all pending motions as moot.

5. The Clerk shall close this case.